BRILLION LUMBER COMPANY, Respondent, vs. BARNARD and another, Appellants.

*March 20—April 9, 1907.*

*Reference: Long account: Principal and surety: Bond of employee: Execution induced by false representations: When bond takes effect: Defenses of surety: Pleading: Amendment: Discretion: Evidence: Books of account, etc.: Appeal: Directing judgment.*

1. An order of compulsory reference may be based in part on statements of counsel to which no objection is made; and where such statements are not preserved in the record it will be presumed that the reference was proper.

2. To warrant a compulsory reference under sec. 2864, Stats. (1898), on the ground that the examination of a long account will be necessary, the action need not be strictly based on the account or be for an accounting. It is sufficient if there is a long account in the proper sense which is directly involved, so that it must, in the regular course of the trial, necessarily be examined as substantially the basis of the claim for a recovery.

3. If the proposed surety in a bond for the conduct of an employee makes inquiry of the proposed obligee as to the previous conduct of the employee, such obligee is bound to make full disclosure of all material facts within his knowledge bearing on the risk, and if he fails to do so or knowingly makes, in response to the inquiry, false representations as to such facts, or does so ignorantly but under such circumstances as would naturally lead the inquirer to believe the representations to be based on an investigation, and the proposed surety is thereby induced to sign the bond, he may avoid liability thereon on the ground of fraud.

4. But an innocent false representation in such a case, such as the assertion of a mere opinion or the misstatement of a fact through mere ordinary negligence, not made under such circumstances as to suggest that it was based on an investigation, will not relieve the surety of liability.

5. In general a bond speaks from its date, but upon proof that it was delivered at a later time the primary presumption is displaced by one that it was intended to take effect from its delivery only, unless by its terms it satisfactorily appears that the parties intended it to take effect from its date or some other time.

Brillion Lumber Co. v. Barnard, 131 Wis. 284.

6. A bond given to secure faithful performance by an employee of his duties under a contract of employment dated February 11, bore the same date, but was not delivered till May 6. When first presented for signature the bond provided that it should "expire with the time of service as specified in the contract" (which time was not fixed but depended on mutual satisfaction of the parties), but before being signed it was changed so as to provide that it should "expire one year from the date hereof." *Held*, that the bond took effect as of the date of the contract and covered defalcations, if any, between such date and its delivery.

7. In an action by an employer upon the bond of an employee, the surety must specially plead, in order to avail himself of, the defense of a release by reason of the employer having made a contract with the employee permitting the latter to repay the money misappropriated by working a sufficient length of time to balance the same with his wages, or by reason of the imposition upon the employee of duties not contemplated by the contract and materially increasing the risk of the surety, or by reason of the employer having prejudicially retained the employee in the service after discovering his delinquency, concealing the situation from the surety.

8. Refusal to permit an answer to be amended so as to set up new defenses is *held* not an abuse of discretion where no excuse was given for delay in making the application.

9. In an action upon the bond of an employee the books kept by him as a part of his duties during the period of service covered by the bond are evidence against the surety, but not so as to unverified invoices and books kept by the employee before said period.

10. Thus, an inventory of stock on hand a month and a half before the commencement of the term of service covered by the bond, together with unverified invoices and a sales book kept by the employee, do not, as against a surety on the bond, show the amount of stock on hand when said term of service began.

11. Where there was a failure of proof as to some fact essential to a recovery and there is no reasonable probability that the lacking proof would be supplied on another trial, the supreme court will direct the judgment to be entered below without remanding the case for a further hearing.

APPEAL from a judgment of the circuit court for Calumet county: GEO. W. BURNELL, Circuit Judge. *Reversed in part; affirmed in part.*

Action to recover of a surety.

This in substance is the plaintiff's claim as pleaded: February 11, 1901, plaintiff and defendant *George Barnard* made a contract whereby the latter engaged in the service of the former as retail salesman and manager of its lumber yard at Collins, Wisconsin, agreeing to faithfully perform his duties as such, to attend to the plaintiff's business, not absenting himself therefrom except through unavoidable circumstances, to perform his duties to the best of his ability and pay over all money received belonging to plaintiff and vouch for the correctness of the accounts made by him, and to keep an accurate record of all his transactions in respect to the business in the plaintiff's books, the service to continue so long as mutually satisfactory, subject to the right of either party to terminate the contract on ten days' notice, the plaintiff to pay for the service $45 per month. In consideration of entering into said contract, February 11th, aforesaid, defendants delivered to the plaintiff a bond promising to pay the latter $1,000, conditioned upon the principal obligee fully performing the obligations of said contract on his part. Breaches of the contract were alleged to have occurred after the giving of the bond, in that *George Barnard* received proceeds of lumber stock sold out of plaintiff's yard to the amount of $201.10 which he failed to pay over to the plaintiff, and received from the latter building material to the value of $834.51 which he failed and refused to account for.

The defendant *George Barnard* answered setting forth, among other things, that the bond was given without consideration a considerable period of time after the making of the contract, to wit, May 6, 1901, and putting in issue all the allegations of the complaint in respect to breaches of the contract. The defendant *Charles A. Barnard* answered, putting in issue the allegation as to the contract having been breached and to the effect that if *George Barnard* was guilty, as alleged in the complaint, the wrongful acts occurred prior to the giving of

the bond and were known to the plaintiff, but were fraudu-
lently concealed for the purpose of inducing said defendant
to sign the bond, and that he signed the same relying on the
assurance made to him on behalf of plaintiff that *George Bar-
nard's* accounts were correct and his services entirely satisfac-
tory, and that had it not been for such assurance he would not
have signed.

The following is a copy of the contract:

"Articles of agreement made and concluded this 11th day
of February, 1901, between the *Brillion Lumber Co.*, of Bril-
lion, Calumet county, Wisconsin, and *George Barnard* of the
same place, in manner following, to wit:

"The said *George Barnard* covenants and agrees faithfully,
truthfully and diligently to act as retail salesman for the said
*Brillion Lumber Co.*, at their yard at Collins, Manitowoc
county, Wisconsin, from the day hereof, for and during such
time as both are satisfied, without absenting himself from the
same during which time, unless through unavoidable circum-
stances it be necessary to do so. If at any time either party
desires to annul this contract it shall be the duty of such party
to inform the other party of this contract, in writing, at least
thirty days in advance, of such desire and intention.

"The said *George Barnard* will attend and do and perform
his work during business hours to the best of his ability, and
further agrees to pay over all money which may be received by
him, arriving from said business, to the said *Brillion Lumber
Co.*, vouch for the veracity and correctness of all accounts,
in consequence of all transactions and contracts made which
shall be duly recorded upon the books of the company; and
use due discretion, to the best of his ability and judgment, in
extending credit. In consideration of such service, so to be
performed, the said *Brillion Lumber Co.* agrees to pay the
said *George Barnard* the sum of forty-five ($45) per month.

"In witness whereof, we have hereunto set our hands and
seals the day and year above written.

    "[Signed]                BRILLION LUMBER Co.
                            "Per Her. Behn. Sec.
                 "GEO. BARNARD.

"In presence of
    "Herman Hehn.
    "William Schulz."

The following is a copy of the bond:

"Know all men by these presents, that we, *George Barnard* and *C. A. Barnard,* of the town of Brillion, Calumet Co., Wisconsin, are held and firmly bound unto the *Brillion Lumber Co.,* of the same place, in the sum of one thousand dollars ($1,000) good and lawful money of the United States, to be paid to the said *Brillion Lumber Co.,* their executors, administrators and assigns, to which payment well and truly to be made, we do bind ourselves, our heirs, executors and administrators firmly by these presents.

"Sealed with our seals and dated this 11th day of February, 1901.

"The condition of this obligation is such that if the above bounded *George Barnard,* his executors, administrators or assigns shall in all things stand to and abide by, and well and truly keep and perform the covenants, conditions and agreements mentioned and contained in an instrument of agreement this day entered into by and between him and the *Brillion Lumber Co.* on his the *Geo. Barnard* part, to be kept and performed at the time and in the manner and form herein stated, then the above obligation shall be null and void, otherwise to remain in full force and effect.

"This bond will expire one year from date hereof.
        "[Signed]                 GEO. BARNARD.    [Seal.]
        "[Signed]                 C. A. BARNARD.    [Seal.]"

The last clause of the bond when it was presented to *Charles A. Barnard* was worded thus: "This bond is to expire with time of service as specified in contract." It was changed to read as indicated in the copy.

A compulsory reference was granted on plaintiff's motion to hear, try, and determine all the issues, except that of fraud in securing *Charles A. Barnard's* signature to the bond, and want of consideration for such signing, which were reserved to be tried by a jury.

On the disputed questions referred as aforesaid the referee found that while *George Barnard* was in plaintiff's employ under the contract he converted to his own use proceeds of sales of lumber, which should have been paid to the plaintiff,

to the amount of $134.81, and disposed of and converted to his own use during the same time building material belonging to the plaintiff to the amount of $502.29, making a total of $637.10, and that before the commencement of the action restitution thereof was demanded of both defendants and refused, and that plaintiff was entitled to judgment accordingly.

Plaintiff's counsel duly moved for a confirmation of the referee's report and defendants' counsel likewise moved for a vacation thereof because the issues were improperly referred, and opposed plaintiff's motion upon exceptions to the findings, which will be referred to so far as necessary in the opinion. Plaintiff's motion was granted, subject to a determination of the issues reserved to be tried by the jury. Thereafter such issues were tried, a verdict being directed in the plaintiff's favor. Before the verdict was so directed the court announced an opinion that the only question for determination was in respect to whether the bond was secured by fraud, misrepresentation, or concealment on the part of the plaintiff or any of its officers or agents. The defendants' counsel asked to have submitted to the jury as material controverted matters the following, in substance: Did *George Barnard* unlawfully appropriate to his own use plaintiff's money as early as April, 1901? Did the plaintiff on or about October 17, 1901, know that *George Barnard* prior thereto had collected money belonging to the plaintiff and unlawfully appropriated the same to his own use? Did the plaintiff on or about October 17, 1901, and until November 18, 1901, pursuant to an agreement with *George Barnard* conceal from *Charles A. Barnard George Barnard's* misconduct as to appropriating plaintiff's money to his own use? Did the plaintiff October 17, 1901, agree with *George Barnard* that the latter should continue in its employ at Brillion, Wisconsin, until by his labor he could repay his indebtedness to the plaintiff? Did *George Barnard* October 17, 1901, enter upon the service indicated and con-

tinue until he was discharged December 3, 1901? The request for the submission of such questions was denied and an answer directed in plaintiff's favor to a question submitted by the court covering the matter in its judgment to be determined, as before indicated. Thereafter judgment was rendered in favor of the plaintiff for the amount specified in the findings of the referee, with interest and costs.

For the appellants there was a brief by *Wigman, Martin & Martin,* and oral argument by *P. H. Martin.* They contended, *inter alia,* that "it is the duty of a person taking a guaranty for the good conduct of an employee to disclose the past malpractices of such employee in the course of the business to which the guaranty relates, and that if such duty is not performed the instrument so taken is *ipso facto* invalid. The continuance of an agent in employment is an act so expressive of trust and confidence that it is tantamount to an express declaration to that effect, and hence it must, under usual circumstances, have all the effect of a meditated fraud, if the person so retaining the agent can be permitted to disown the implications inevitably arising from his own conduct." *Sooy ads. State,* 39 N. J. Law, 135, 147; *Krause v. Busacker,* 105 Wis. 350; *Zunker v. Kuehn,* 113 Wis. 421; *Matteson v. Rice,* 116 Wis. 328; *Richmond v. Standclift,* 14 Vt. 258; *Conn. Gen. L. Ins. Co. v. Chase,* 72 Vt. 176, 53 L. R. A. 510; *Bennett v. Judson,* 21 N. Y. 238; *Fishburn v. Jones,* 37 Ind. 119; *Evans v. Keeland,* 9 Ala. 42; *Marchman v. Robertson,* 77 Ga. 40; *Gasconade Co. v. Sanders,* 49 Mo. 192; *Fenter v. Obaugh,* 17 Ark. 71; *Screwmen's Benev. Asso. v. Smith,* 70 Tex. 168; *Guardian F. & L. Assur. Co. v. Thompson,* 68 Cal. 208; *Franklin Bank v. Cooper,* 36 Me. 179; *S. C.* 39 Me. 542; *Page v. Krekey,* 137 N. Y. 307, 21 L. R. A. 409, note.

For the respondent there was a brief by *Nash & Nash,* and oral argument by *E. G. Nash.*

MARSHALL, J. The first proposition advanced for consideration is that the court erred in referring the issues except that respecting the signature of the surety having been fraudulently obtained, and especially that the court erred in referring the issue as to embezzlement and conversion.

Just what the situation was at the time the reference was ordered does not appear. It is recited in the order that the reference was granted on the pleadings and statements of counsel, but what those statements were was not preserved. If the pleadings alone were not sufficient to warrant the reference they may have been amply supplemented by statements in open court. It was proper to consider such statements, since no objection was made thereto. But independently thereof it seems that the reference was legitimately within the discretion of the court. Sec. 2864, Stats. (1898), provides that a compulsory reference may be granted "when the trial of an issue of fact shall require the examination of a long account on either side; in which case the referee may be directed to hear and decide the whole issue." So if the essential of a reference existed, i. e. the necessity to examine a long account, it was within the court's discretion to refer that only, or that and other issues, or all the issues. How long an account must be to satisfy the statute is very much a matter of judgment on the part of the trial court, but it has been held that twenty or more items are sufficient (*Turner v. Nachtsheim*, 71 Wis. 16, 36 N. W. 637), and that it will do if a long account must be proved by the plaintiff in making out his case, even though the defendant has denied all liability (*U. S. R. S. Co. v. Johnston*, 67 Wis. 182, 30 N. W. 211), and again if the plaintiff's case depends on proving a long account the reference may be granted (*Briggs v. Hiles*, 79 Wis. 571, 48 N. W. 800).

We do not understand that in order to justify a reference the action must be strictly based on the account or for an accounting. The language of the statute clearly indicates

the contrary.    If "the trial of an issue of fact shall require
the examination of a long account on either side," then, ac-
cording to the express language of the statute, the reference
may be directed either as to the whole issue or any specific
question of fact involved.    We are unable to find anything
in *Andrus v. Home Ins. Co.* 73 Wis. 642, 41 N. W. 956, or
*Jordan v. Estate of Warner,* 107 Wis. 539, 550, 83 N. W.
946, restricting the statute within the very narrow limits con-
tended for.    True, mere items of damage do not constitute
an account, and likewise true there must be an account in
the proper sense, and it must be something more than a mere
incidental matter.    It must be a matter forming substantially
the basis of the plaintiff's claim, though the action need not
be on the account nor for an accounting.    References have
been sustained in actions of this nature because of the neces-
sity to examine the principal obligor's account to ascertain
the amount of his defalcation and determine the extent of the
liability of the surety upon the bond.    Such cases are refer-
able because the account is a matter directly involved in the
main issue.    *Dane Co. v. Dunning,* 20 Wis. 210; *Cairns v.
O'Bleness,* 40 Wis. 469; *Andrus v. Home Ins. Co., supra.*
So it is sufficient if there is a long account in the proper sense,
which is directly, not merely collaterally, involved, so that it
must, in the regular course of the trial, necessarily be exam-
ined as substantially the basis of the claim for a recovery.

Here the entire claim of the plaintiff was put in issue by
the answer.    It was clear from the complaint that such claim
involved an account of numerous transactions of debit and
credit covering over nine months' time.    True, much of this
when it came to the trial was not disputed, but the state of
the pleadings was such that it was incumbent on the plaintiff
to prove by evidence the entire account as to lumber sent to
the yard and as to sales reported and collections turned in.
Each and all of the matters involved were open to dispute
under the pleadings.    That made, within the authorities, a

good cause for a reference, even without any aid from statements made in open court by counsel showing the extent to which items or matters relating to the account would probably be disputed.

This is the next question in order: Was there sufficient evidence to require submission of the case to the jury on the subject of whether the signature of the surety was fraudulently obtained, in that the principal obligor was then an embezzler of his employer's money, and it was knowingly concealed from the surety, the state of the accounts between the parties being, upon inquiry by the surety, represented to be correct, and the employee's services entirely satisfactory? It is not claimed that there was any evidence to support the allegation that the person who, on behalf of the respondent, presented the bond to the surety for his signature, knowingly made such false representations, but it is insisted that the actual bad faith alleged is not essential to defeat the bond; that misrepresentation through ignorance is sufficient under the rule in respect to inducing a person to purchase property by means of false statements of material facts, affording such person a judicial remedy for his damages regardless of whether the vendor knew such statements to be untrue or not. The cases in this court where the subject has been dealt with are to the effect, only, that when a person at the time of obtaining the signature of the surety knows facts affecting the risk and knows, or has reasonable ground to believe, the latter is ignorant thereof, upon inquiry by the latter of the former he is bound to make a full disclosure. *Ætna L. Ins. Co. v. Mabbett,* 18 Wis. 668, 672; *Remington S. M. Co. v. Kezertee,* 49 Wis. 409, 5 N. W. 809. The reasoning in those cases is well indicated by the following extract from the first one:

"If a representation to this effect is made to the intended surety by one who knows that there is something not naturally to be expected to take place between the parties to the transaction, and that this is unknown to the person to whom he

makes the representation, and that if it were known to him he would not enter into the contract of suretyship, I think it is evidence of a fraudulent representation on his part."

Again it is said in the last case cited:

"If he undertakes to give the information, [he] is bound to disclose every material fact within his knowledge affecting the proposed liability."

Such is the rule as stated in 1 Brandt, Suretyship & G. (3d ed.) § 476, the following language being used:

"If the party who takes a bond for the conduct of a principal in an employment knows at the time that the principal is then a defaulter in said employment and conceals the fact from the surety, such concealment is a fraud upon the surety and discharges him."

True, if false representations are ignorantly made to a proposed surety by the proposed obligee respecting material facts bearing on the proposed risk, under such circumstances that such proposed surety has reasonable ground to believe that they would not be made except from conviction of the truth resulting from diligent investigation, the result is the same as if the obligee has actual knowledge. *Graves v. Lebanon Nat. Bank,* 10 Bush, 23; *Ashuelot Sav. Bank v. Albee,* 63 N. H. 152. We should say in passing that the first case cited has not been followed except in cases where the misleading representation was made directly to the proposed surety. The rule has no application to a mere assertion of an opinion or condition, as in this case, where the error, if error there were, was owing, at the worst, to such inattention, even negligence, as to the conduct of a trusted employee, as is common between annual settlement days. Speaking on this subject in the Law of Suretyship by Stearns at § 106, the author says:

"Fraud will not be imputed because the creditor, by reason of negligence or inattention to his own affairs, does not know of the facts which materially affect the surety risk."

We recognize that there are authorities which *arguendo* at least go further than above indicated, but the better rule, it

seems, and the weight of authority is that something more than mere innocent misrepresentation—misrepresentation through ordinary negligence or the expression of an opinion— is necessary to constitute fraud equivalent to actual fraud so as to discharge a surety.

It may be stated as a rule that upon the proposed obligee in a surety bond being applied to for information by the proposed surety as to the previous conduct of the proposed principal obligor, it is his duty to make full disclosure of all material facts within his knowledge bearing on the risk, and if he fails to do so, or knowingly makes, in response to the inquiry, false representations as to such facts or ignorantly does so, but under such circumstances as would naturally lead the inquirer to believe the representations to be based on an investigation, as, for instance, representations by a director of a bank charged with the duty of investigating the accounts of its cashier, and the proposed surety is induced thereby to sign the bond, he may avoid liability thereon on the ground of fraud; yet an innocent false representation under the circumstances stated, which is the assertion of a mere opinion or the existence of a fact not derived from investigation or made under such circumstances as to suggest such derivation but entertained and made through mere ordinary negligence, is immaterial. Applying that here, we reach the conclusion that the claim of fraud in obtaining the bond was not sustained by the evidence.

The further question of whether, in any event, the plaintiff would be bound by the representations of its employee in obtaining the bond, they not having been specially authorized and not being within the scope of his ordinary duties, we will pass without discussion, but refer on the subject to *Am. S. Co. v. Pauly,* 170 U. S. 133, 18 Sup. Ct. 552. That case would seem to rule the question in favor of the respondent.

Next in logical order is the suggestion that the bond did not take effect as of the date of the contract nor until the delivery, which occurred May 6th after such date, and there is no proof

but what the defalcation, such as occurred, took place before that date. It is not questioned but what when a bond on its face indicates the intention of all parties thereto to be that it shall cover a period commencing prior to the time of the delivery, it will be given effect accordingly, but it is insisted the indications here are to the contrary, in that the bond when first presented for signature ended with "This bond is to expire with time of service as specified in contract," and before it was signed that was changed to the following: "This bond will expire one year from date hereof." We are unable to draw the inference which the learned counsel for appellants do from that circumstance. It seems that the change was made so as to render the period covered by the surety contract certain. The time of the termination of the period was by the change rendered unmistakable, whereas before it was uncertain. The time of its commencement was, by necessary inference at least, fixed by reference to the contract. The term was expressly made one year commencing with the date of the bond. That date was February 11th, the date of the contract. The condition of the bond was for the performance of all the obligations of the contract entered into on such date. That would seem to indicate expressly that the bond was intended to take effect contemporaneously with the date of the contract.

In *Ætna L. Ins. Co. v. Am. S. Co.* 34 Fed. 291, we have a situation very closely analogous to the one before us. The bond was dated June 15, 1884. It was not delivered till July 15th thereafter. A certificate of character of the obligor had been furnished with a blank therein to be filled up with the date of the bond. "June 15, 1884," was written therein. The bond declared that it was made on that date and was in consideration of a premium for the term of twelve months ending June 15, 1885. In that situation the court held that the bond took effect upon its delivery, by relation, as of its date. The rule on this subject may be stated thus: In general a bond

speaks from its date, but upon proof that it was delivered at
a later time, the primary presumption is displaced by one that
it was intended to take effect from its delivery only, unless by
its terms it satisfactorily appears that the parties intended
the instrument to take effect from its date or some other time.
To that effect are *Supreme Council C. K. v. Fidelity & C.
Co.* 63 Fed. 48; *Hatch v. Attleborough,* 97 Mass. 533; *Oregon
R. & N. Co. v. Swinburne,* 22 Oreg. 574, 30 Pac. 322; *Mc-
Intire v. Linehan,* 178 Mass. 263, 59 N. E. 767; *Hudson v.
Miles,* 185 Mass. 582, 71 N. E. 63.

The finding and the special verdict, in view of the fore-
going, fully support the judgment contrary to the contention
of appellants' counsel.  As we have seen, the bond took effect
as of date of the contract.  It is expressly found that the de-
falcation occurred during the period commencing with service
under the contract and terminating when such service ceased.
So we pass this branch of the case without further discussion.
Counsel's contention in regard to it seems to be based on the
mistaken idea that the bond did not take effect till the date of
its delivery and that the defalcation, so far as any occurred,
took place, or may have taken place, for aught that appears
in the case, between the date of the contract and the time of
such delivery.

It stands as a verity in the case that *George Barnard* appro-
priated to his own use $134.81 which he ought to have paid
over to the respondent.  That misappropriation is conceded,
and the only objections to the judgment in respect thereto
have now been ruled in favor of the respondent, except as re-
gards matters claimed to have extinguished the liability after
it accrued.  Those matters are three in number, none of which
were pleaded by the appellants, viz.: (1) The surety was re-
leased by reason of the respondent having made a contract
with the principal obligor permitting him to repay the money
misappropriated by working a sufficient length of time to bal-
ance the same with his wages.  (2) Duties were imposed on

such obligor not contemplated by the contract, materially increasing the risk of the surety. (3) Respondent prejudicially retained the unfaithful employee in its service after discovering his delinquency, concealing the situation from the surety. They were clearly all defensive matters, required to be specially pleaded in order to entitle the appellants to avail themselves of them. Some evidence in respect to such matters was drawn out before the referee, but it is clear they were not considered within the issues to be tried before him. He was asked to make a finding in respect to one of them and the request was refused. That refusal was excepted to and such exception was sustained upon the hearing before the court on the motion to confirm the referee's report. When the trial of the issue reserved was had counsel for appellants endeavored to introduce evidence to establish the unpleaded defenses, and the same, as a rule, was excluded, the court holding that they were not within the issues presented for trial, and that if appellants desired to have such matters litigated, they not having been pleaded in the first instance, leave to amend should have been requested upon the trial before the referee. Counsel then proposed amendments obviating the difficulty and offered to pay any reasonable terms that might be imposed as a condition of the favor being granted, but no showing was made excusing the failure to bring in the proposed defenses at the first opportunity, or failure to bring them in by proper amendments before the referee. In that situation, upon objection by counsel for respondent, permission to amend the answer as desired was denied. The application was addressed to the sound discretion of the court, and in view of the failure to excuse the delay, as indicated, it is considered that such discretion was properly exercised in respondent's favor. That conclusion renders it unnecessary to consider whether there was evidence establishing the facts claimed by appellants' counsel as to any of such three defensive matters or the legal result that would flow from the ex-

istence of such facts if they were legitimately established in the case.

The remaining important question is this: Is there evidence to sustain the finding as to the shortage in building material of $502.29? There seems to be a fatal defect in the proof as to that matter, in that there was no evidence offered showing the amount of stock on hand at the date of the contract. There was an inventory taken of the stock December 31, 1900, nearly a month and a half before the bond took effect. The correctness of that inventory was fairly established. The shortage claimed was arrived at by adding to the stock as per such inventory all material shipped into the yard thereafter up to November 28, 1901, shown by the invoices sent to *George Barnard* as representing the shipments and deducting therefrom the lumber sold, as indicated by the sales book kept by him, and assuming, without making any allowance for waste or breakage and other causes characteristic of such a business as the same was carried on, that the result indicated the correct amount of stock that ought to be on hand. Such result was then taken from the inventory of November 28th aforesaid, which was fairly verified, and the balance was claimed to be the fraudulent shortage. The referee adopted that view. For aught that appears the entire shortage might have occurred between the date of the first inventory and that of the contract, and again it might be accounted for to a considerable extent by ordinary waste in the operation of the yard.

There was ample proof showing with reasonable certainty that considerable waste during a period of nearly a year would necessarily occur in a lumber yard, as the one in question was operated, by reason of breakage and the substitution of a merchantable board now and then in making a sale for an unmerchantable one, letting the latter go in without making account thereof, and to avoid losing a customer selling lumber of a given length for shorter stuff when the latter was

wanted but was not in stock. Without going into the evidence in detail, showing fully the grounds thereof, serious doubt is entertained by the court as to whether the finding could be sustained, in any event, on account of the referee and the court assuming that the lumber shown to be on hand at one time, with the additions to the stock thereafter made, should exactly balance the sales and lumber on hand nearly a year later, in face of the uncontradicted evidence and common knowledge, we may well say, that there is necessarily considerable waste in such a business. There is quite persuasive evidence in the record other than that in respect to ordinary waste, tending to show how some of the shortage probably occurred entirely consistent with the integrity of *George Barnard,* but as the final conclusion we have reached follows necessarily from a palpable defect in the proof as to the amount of lumber on hand at the date of the contract we will not further discuss the question of whether, aside from that, the finding of the referee could be supported as not contrary to the clear preponderance of the evidence.

Counsel for respondent assumed that the record of the business as conducted by *George Barnard* showed *prima facie,* as against the surety, the amount of lumber received and the sales made. The referee and the court adopted that view. Counsel for appellants insist that the books and records kept by *George Barnard* other than books of account, within the meaning of the statute, properly verified, were mere hearsay evidence as against the surety, and that as the correctness of the invoices purporting to show the additions to the yard was not verified, there was a total failure of proof as to the surety regarding the additions to the stock after the inventory of December, 1900. As to the transactions commencing with work under the contract, the records kept by *George Barnard* of receipts and sales of lumber were evidence against him, and his surety likewise, because that matter was covered by

the contract, in that it required all transactions to be entered upon the books and the correctness thereof to be vouched for by the employee. The rule is that books kept by a principal obligor as part of his duties are evidence against the surety. *Williamsburg City F. Ins. Co. v. Frothingham,* 122 Mass. 391; *Agricultural Ins. Co. v. Keeler,* 44 Conn. 161; *Bricker v. Stone,* 47 Mo. App. 530; 2 Ency. of Ev. 676. But as to the period between December 31, 1900, and February 11, 1901, the invoices and sales book were not evidence against the surety. So the case was left with absolutely no proof of the amount of lumber on hand when the bond was taken.

We are not unmindful of the decision in *Clark v. Wilkinson,* 59 Wis. 543, 18 N. W. 481, to the effect that where a guardian pursuant to an order of court gives a second and additional bond the presumption, in the absence of evidence to the contrary, is that there has been no previous misappropriation. That was based on the facts of that case, particularly those with reference to regular accounting of the guardian and approval of his accounts. Generally speaking, it cannot be presumed in a case of this sort that there has been no defalcation between the date of a settlement made some time prior to the giving of the bond and such time. That is recognized in the case cited. A pretty full discussion of that subject will be found in *Anaheim U. W. Co. v. Parker,* 101 Cal. 483, 35 Pac. 1048.

*Trustees of Schools v. Smith,* 88 Ill. 181, is quite analogous to the case in hand on the subject under discussion. There a person was his own successor to the office of school treasurer. He gave a new bond at the commencement of his second term. Subsequently he was found to be a defaulter. In a prosecution to recover of his bondsmen it was insisted that proof of the amount of money which he ought to have had in his hands at the commencement of the second term was *prima facie* proof that he had it in fact, and cast upon the bondsmen the

burden of proving the contrary. The court said in respect to the matter:

"The defalcation is established, but the time at which it occurred, whether during the first term or subsequent to the reappointment, does not appear, and we do not see why it may not as well be presumed that the treasurer misappropriated the money during the time of his first term of office as during the time which elapsed after his reappointment."

It may be, as indicated in some of the authorities cited in *Anaheim U. W. Co. v. Parker, supra,* that proof of money or property being in the hands of the principal obligor shortly before the giving of the bond would be some evidence of its being in his possession at the later date, but that could hardly extend to a period of a month and a half, and if it could and the rule were applicable to this case there would still be a failure of proof as to additions to the yard and sales out of the yard in the meantime, because of the sales book and unverified invoices not being evidence against the surety as to the period before the date of the contract.

It is the opinion of the court that on account of the fatal infirmity in the proof, as above indicated, the judgment respecting the shortage in building material must be reversed. If a reasonable probability were apparent that the failure of proof might be supplied the court would be inclined to remand the case for a further hearing, but since it seems the condition is otherwise, and counsel for appellants freely admitted on the argument that all the proof was produced before the referee which was obtainable, it is considered that the litigation should be terminated with this hearing. The counsel evidently presented the case of the respondent in the most favorable aspect the evidence discovered, or reasonably discoverable, would permit. Therefore, to prolong the litigation would only cause needless expense upon both sides.

*By the Court.*—The judgment as to the allowance for shortage in building material is reversed. As to the costs

taxed in the court below of $101.01, and the shortage in money received for lumber sold, $134.81, with interest on, the latter from the time of the commencement of the action up to the time of the rendition of the judgment appealed from, such judgment is affirmed as of its date.

CASSODAY, C. J., took no part.