FIRST NATIONAL BANK & TRUST COMPANY OF RACINE, Plaintiff-Respondent and Cross-Appellant-Petitioner,

v.

Robert NOTTE, Defendant-Appellant and Cross-Respondent.

Supreme Court

*No. 78–604. Argued June 4, 1980.—*
*Decided June 27, 1980.*

(Also reported in 293 N.W.2d 530.)

For the First National Bank and Trust Company there were briefs by *Lincoln K. Murphy, Hann & Quinn, S.C.*, and oral argument by *Matthew H. Quinn*, all of Racine.

For the defendant-appellant there was a brief by *James A. Pitts* and *Capwell, Berthelsen, Nolden & Casanova, Ltd.*, of Racine, and oral argument by *James A. Pitts* and *Rex Capwell*.

Amicus curiae brief was filed by *Boardman, Suhr, Curry & Field* of Madison, for Wisconsin Bankers Association.

DAY, J. The First National Bank and Trust Company of Racine (First National) brought this action against Robert Notte to recover the balance owing on a "Consumer Installment Note and Chattel Security Agreement" in the amount of $16,372.85 plus interest and costs. Mr. Notte acted as a gratuitous co-signer for the principal debtor, Pauline McCloud, who defaulted on the obligation and later filed a petition in bankruptcy.

The question presented for review is under what circumstances will a contractual surety obligation be rendered voidable based on the material misrepresentation or nondisclosure of a creditor. We conclude that the creditor has a duty to make disclosure to a proposed surety if the creditor knows of facts that materially increase the risk beyond that which the creditor has reason

to believe the surety intends to assume, and the creditor has reason to believe that the surety does not know these facts and the creditor has a reasonable opportunity to communicate them to the surety. Failure to disclose under these circumstances will be a defense to the surety obligation. We also conclude that if a party to a contract is induced to manifest his assent to the contract by a means of a fraudulent or material misrepresentation by another party to the contract, the contract is voidable if the recipient justifiably relies on the misrepresentation. Because the case was submitted to the jury on an improper theory of law, we remand the case for a new trial.

## I.

Pauline McCloud, the principal debtor on the note, owned and operated a beauty salon business. Prior to the loan in controversy here, she had taken out seventeen loans with First National since 1958. All of these loans were paid within the end term of the contract. Only two of the 273 payments made to the bank in that time period required a second notice.

The developments leading up to the issuance of the defaulted loan in controversy here began in 1974. In February of that year, Ms. McCloud applied for a loan of $41,000 from First National to remodel and equip the "Tartan Room," one of her hairstyling establishments. In March that loan application was denied. Then in November, 1974 and again in April, 1975, loans were made by First National in the amount of $2,500 and $3,000 respectively for the purpose of remodeling and buying fixtures for the Tartan Room. Both of these loans were secured by the cash surrender value of life insurance owned by Ms. McCloud.

In May, 1975, Pauline McCloud spoke with the vice-president in charge of lending at First National, Till A.

Bruett. Mr. Bruett had been involved in the lending decision as to the prior three loan applications discussed above. He testified at the trial that Ms. McCloud told him that another bank in town would loan her "thirty some odd thousand dollars" to remodel the Tartan Room and she requested another $13,000 from First National so that she could purchase fixtures. First National agreed to make the loan on the condition that she provide the bank with a third mortgage on real estate that she owned on Douglas Avenue, a lien on the fixtures, and a suitable co-signer. The documents formalizing the contract were prepared by First National and were dated May 21, 1975. Ms. McCloud picked up the documents from the bank and nothing was heard from her until early June when she talked to Mr. Bruett and told him that the other bank would loan her $29,000 but they would require a third mortgage on the Douglas Avenue property. After Mr. Bruett discussed this change of circumstances with the president of the bank, it was "decided that based on Bob Notte's credit record and reputation" they would go ahead with the loan without the third mortgage.[1]

Sometime later, Mr. Notte called Mr. Bruett to inquire about Pauline McCloud's credit record with the bank. Mr. Bruett stated that Ms. McCloud's credit record with the bank was good and that she had always paid her loans. After talking with Mr. Bruett, Mr. Notte signed the note and the explanation of the co-signer obligation.

---

[1] According to the testimony of Mr. Bruett, the Douglas Avenue property was purchased for $65,000 approximately two years before the application for the present loan was made. It was encumbered by a $41,000 first mortgage and an $11,500 second mortgage. Although the record is not completely clear, the third and fourth mortgages taken out by the bank that had agreed to loan Ms. McCloud the $29,000 were not in existence when the documents were drawn up by First National. These mortgages may have been filed and secured when Mr. Notte signed the note and the explanation of the co-signer's obligation.

Problems arose immediately. Ms. McCloud was late with the first payment. She then made a couple of more payments and then all payments ceased. Mr. Notte made payments for a number of months and then he too ceased making them after consulting with his attorney.

The loan agreement which Mr. Notte signed stated that the bank was lending Pauline McCloud, $15,500 with an additional $565 fee added for insurance. The interest to be charged was computed at a rate of 10.76 percent. The total charge including interest over the term of the agreement was $20,913. The agreement also stated that there would be a lien on real estate and a security interest taken in all furniture, fixtures, and equipment in the Tartan Room. Further, a box was checked designating that the loan proceeds were to be used primarily for personal, family or household purposes. Also, unknown to Mr. Notte, and not on the face of the loan agreement, was the fact that First National disbursed only $12,916.67 directly to Ms. McCloud. The remaining balance of the principal was used to pay off the indebtedness remaining on Ms. McCloud's prior loan of $2,500 from First National. When the trustee in bankruptcy abandoned the property to the bank, an auction of the fixtures and equipment was held. After expenses, $250 was realized for application to the balance due on the loan.

Mr. Notte had dealt with First National in securing two short term loans for himself in late 1973 and early 1974. He secured the first loan through Mr. Bruett.

The trial court, over the objection of Mr. Notte, submitted the case to the jury on theories of negligent and intentional misrepresentation. The jury was also instructed on comparative negligence and in the special verdict the jury determined First National to be thirty-three percent negligent and Mr. Notte sixty-seven percent negligent. After hearing the post trial motions, including a motion for a new trial, a verdict was entered

in favor of First National in the amount of $10,305.82, this amount representing sixty-seven percent of the outstanding debt. A notice of appeal and cross-appeal were duly filed by the parties. The court of appeals in an unpublished *per curiam* opinion[2] reversed the trial court, holding that strict liability would be imposed for First National's misrepresentations and that Mr. Notte was therefore entitled to rescission of the transaction.

The confusion apparent in this case originates from the lower courts' and the parties' treatment of the issues raised in a framework based on traditional tort concepts of misrepresentation. Such treatment, however, is not appropriate. This is a suit to recover on a contract. The defense raised in the pleading is one to the contract. We, therefore, look to principles of contract and suretyship law in framing the issues and formulating a mode of analysis.

## II.

Mr. Notte raised by answer various affirmative defenses in the alternative including, that he was discharged from his contractual obligation because of material alterations or changes in the loan agreement; that the securities which were listed in the loan agreement, were released without his consent; that the fixtures and other equipment were negligently or irregularly sold; and finally that he should be discharged of his obligation as a co-signer based on the fraud, collusion, false representations, and material misrepresentations of First National.

From the defendant's answer it is apparent that he was attempting to avoid liability on the contract; not assert a claim for damages based on tort principles.

[2] 91 Wis.2d 844, 282 N.W.2d 637 (1979); decision dated and released June 25, 1979.

When the underlying question is one of the right to recover on a contract or the defenses thereto, any discussion of comparison of negligence between the parties is inappropriate. If Mr. Notte alleged by way of counterclaim, damages resulting from misrepresentations which induced him to enter the underlying contractual relationship, a different question would arise. The introductory note to the Restatement (Second) of *Contracts*, Chapter 13 at 1 (Tent. Draft No. 11, 1976), dealing with misrepresentation discusses the interrelationship between contract and tort actions for misrepresentation. It is noted that avoidance is primarily dealt with in the contract action, while an affirmative claim for liability may lie for misrepresentation under the law of torts. Although the requirements for establishing misrepresentation sufficient to avoid a contract and the rules for establishing tort liability parallel each other closely, there are differences.[3] Because there is an affirmative liability for damages in a tort action, while a defense alleging that a contract is void or voidable for misrepresentation or nondisclosure does not itself result in a damage award, the requirements imposed by contract law are in some instances less stringent. This court has previously recognized this distinction in *Whipp v. Iverson*, 43 Wis.2d 166, 171, 168 N.W.2d 201 (1969), where it was observed that when law and equity were separate systems, rescission was granted in cases of honest misrepresentation where no affirmative action for damages would lie. Even when damages are recoverable in a contract action as part of the remedy, the damages awarded are limited to those

---

[3] The close parallel between the two types of suits has led to some confusion that persists today. *See,* W. Prosser, *Law of Torts*, §105, pp. 689–691 (4th Ed. 1975); F. W. Harper and M. C. McNeely, *A Synthesis Of The Law Of Misrepresentation*, 22 Minn. L. Rev. 939, 964–967 (1938); 5 S. Williston, *Contracts*, §1487 (rev. ed. 1937); F. James, Jr., and O. S. Gray, *Misrepresentation—Part II*, 37 Md. L. Rev. 488, 539–541 (1978).

reasonably within the contemplation of the parties when the contract was entered, while in tort actions a much broader measure of damages is applied. W. Prosser, *Law of Torts*, §92 (4th Ed. 1971).

The obligation of a creditor not to misrepresent material facts affecting the surety's risk, must be divided into two separate categories. The first involves situations where the non-disclosure of material facts known to the creditor may be sufficient to avoid a surety's contract. The second type of misrepresentation typically involves affirmative statements made by the creditor which reflect on the risk which are false when made or are false when the surety undertakes the obligation.

## III.

Because both types of misrepresentation are alleged to have occurred in this case, we, of necessity, must deal with both questions. We first address the duty of a creditor to disclose information to a surety. Although the creditor owes a surety a duty of continuous good faith and fair dealing, there is no general obligation imposed upon the creditor to disclose to the surety all matters which the creditor knows might affect the surety's risk. There are, however, circumstances under which the creditor may be required to make disclosure and the failure to do so will discharge the surety. In such circumstances it is not necessary that the concealment or the failure to disclose facts material to the surety be wilfully done by the creditor, or that the creditor have the intent to deceive. The motive behind the concealment or misrepresentation is immaterial. A. Stearns, *The Law Of Suretyship*, §7.15 (5th Ed. 1951); *Sumitomo Bank Of California v. Iwasaki*, 70 Cal.2d 81, 73 Cal. Rptr. 564, 447 P.2d 956 (1968). Although the

surety is considered "a favorite of the law," the relationship between the creditor and the surety does not in itself give rise to strict fiduciary obligations. *Sumitomo Bank Of California,* 70 Cal.2d at 85 (n. 3).

One of the early decisions of this court, *Aetna Life Insurance Co. v. Mabbett,* 18 Wis. (*667) 698 (1864), involved an action brought by an insurance company against the sureties of an agent of the insurance company. The sureties executed a bond stating that they would pay on the bond if the agent failed to turn over all revenue collected minus any commissions owing.[4] The sureties asserted as a defense the fraudulent concealment of the state of the accounts between the agent and the company. The insurance company was alleged to have taken the bond at a time when the principal obligor had defaulted in the transaction of the business. On these facts, the sureties claimed they were induced to execute and deliver the bond. The insurance company had no prior dealing with the sureties; no inquiry was made on the part of the sureties to the company; and

---

[4] The three cases discussed herein, *Aetna Life Insurance Co., supra; Remington Sewing Machine Co. v. Kezertee,* 49 Wis. 409, 5 N.W. 809 (1880) and *Brillion Lumber Co. v. Barnard,* 131 Wis. 284, 111 N.W. 483 (1907), are concerned with the security given for the faithful performance of a contract by the principal obligor. There is a distinction between the fidelity bond and the creditor bond. The fidelity bond guarantees the personal honesty of an officer and promises indemnity against his defalcation or negligence. The surety on the creditor bond binds himself for the debtor promising to pay the obligation if the debtor does not. *Sumitomo Bank Of California v. Iwasaki,* 70 Cal.2d 81, 87, 73 Cal. Rptr. 564, 447 P.2d 956 (n. 5) (1968). The California Supreme Court in *Sumitomo* traced the historical distinction that existed between the duty of disclosure by the obligee to sureties in fidelity bond cases and those imposed in the typical creditor bond case. When fidelity bonds were sought a higher burden was placed on the obligee to disclose material facts to the proposed surety, the distinction primarily being based on the nature of the relationship between the parties that was thought to have existed.

the insurance company made no effort to secure the defendants as sureties. This court held that no relation of trust or confidence between the sureties and the insurance company could be held to have arisen upon which a fraudulent concealment in the law could be founded. The court stated:

"Concealment, to be fraudulent and material, must be a concealment of something which the party concealing was bound to disclose; and in order that he may be so bound, there must, in general, we may say invariably, exist some relation of trust and confidence between the immediate parties. The fraud consists in the breach of a trust or confidence justly reposed, and, in most if not all cases, the silence of the party must import as much as a direct affirmation, and must be deemed equivalent to it. 1 Story's Equity, §214. Whether there be such relation of trust and confidence must, of course, depend very much on the circumstances of the particular case, and the course of dealing between the parties. Here it is obvious that there was none." *Aetna Life Insurance Co. v. Mabbett,* 18 Wis. at [*670] 700–701 (1864).

This court in *Aetna* quoted extensively from the opinion of Blackburn, J., in *Lee v. Jones,* 144 Eng. Rep. 194, 202 (Exch. C. 1864). There it was stated that disclosure of all material circumstances affecting the risk is a rule peculiar to contracts of insurance and did not extend to "contracts of guaranty." In the usual case, it was stated that a surety is assumed to have obtained from the principal debtor all the information that he will require. A further concern was expressed that a broad disclosure rule would practically prohibit the obtainment of a surety obligation in matters of business. Based on these authorities, this court in *Aetna* held the defense asserted by the surety to be insufficient on the facts as presented.

The next opportunity that this court had to examine the creditor's obligation to disclose to a surety arose in *Remington Sewing Machine Co. v. Kezertee,* 49 Wis.

409, 5 N.W. 809 (1880). The sureties were again named as defendants in that action and their only defense was based on fraudulent concealment and representations of an agent of the creditor regarding the solvency and financial condition of the principal debtor. The sureties declined to enter into the contract until the financial condition of the debtor was disclosed. The agent of the Remington Sewing Machine Company made assertions regarding the financial condition of the debtor that while literally true, gave the impression that the debtor was in good financial condition when in actuality the debtor had incurred substantial debts with the company.

The court held that the jury's verdict in favor of the sureties would not be disturbed on appeal. "[I]f a person who contemplates becoming a surety . . . applies to the creditor . . . for information as to the nature, extent and risk of the obligation, or the circumstances, condition or character of such third person, the creditor, if he undertakes to give the information, is bound to disclose every material fact within his knowledge affecting the proposed liability." *Remington Sewing Machine Co. v. Kezertee,* 49 Wis. at 414. Because the sureties relied both on the representations made, and that such representations constituted a full disclosure of the financial condition of the debtor, the reliance was justified and a valid defense existed.

These cases were undoubtedly good law at the time of their pronouncement, and to a large extent they retain validity today. However, the law in this area has not remained static. The substantial lapse in time between the case currently before this court and these earlier decisions, necessitates a re-examination of the creditor's duty of disclosure to the proposed surety. After careful consideration, we conclude that the rule as stated in the Restatement of *Security,* §124(1) (1941) is a correct

reflection of the current state of the law. We hereby adopt the disclosure rule provided in that section which states:

"Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety."

To be noted is the fact that there is no duty imposed on the creditor to conduct an investigation for the surety regarding the risk to be undertaken. Therefore, if the creditor is nothing more than negligent in not discovering facts which affect the risk the surety will not be discharged of his obligation. As the comments to this section indicate, there may be some difficulty in ascertaining the precise degree of knowledge possessed by the surety and in determining the materiality of facts which were not disclosed. Restatement of *Security*, §124, Comment b (1941). But these ordinarily will be questions for the trier of fact.

The existence of a relationship of trust and confidence is not required before a duty to disclose arises. However, the existence of such a relationship may reflect on the reasonableness of the belief concerning the risk the surety intends to assume; the facts which the creditor has reason to believe the surety possesses; and the opportunity of the creditor to communicate such facts to the surety.

When an inquiry by the surety is made, the rule still has application. The only difference is that in this situation the creditor knows that the surety lacks knowledge of a material fact affecting the risk. The nature and

extent of the inquiry will determine the extent of the duty to disclose, and in this regard, the decision in *Remington Sewing Machine Co. v. Kezertee, supra,* retains validity.

The Wisconsin Bankers Association as *amicus curiae* expresses legitimate concern regarding the duty imposed upon financial institutions to protect the customer's expectation of privacy in their financial records. *See generally, State v. Starke,* 81 Wis.2d 399, 419, 260 N.W.2d 739 (1978), (Abrahamson, J., concurring). The position we adopt today does not serve to lessen the legitimate expectations of privacy that customers have in their bank records. The creditor simply cannot use the privacy interests of third parties as a shield to protect itself from legal duties otherwise imposed. When disclosure of a material fact to a proposed surety would violate a duty imposed on the creditor by law, the creditor cannot accept the surety obligation. "The mere fact that the creditor should not disclose information should not enable him to take advantage of the information to the detriment of the surety." Restatement of *Security,* §124 (1), Comment d. (1941). Nondisclosure can form the basis for a misrepresentation sufficient to allow the avoidance of a contract obligation under general principles of contract law. Restatement (Second) of *Contracts,* §303 (Tent. Draft No. 11, 1976). The rule announced today is merely a special application of the more general nondisclosure rules for contract avoidance.[5]

[5] The Restatement view we adopted today has been accepted or applied by other courts as well. *Sumitomo Bank Of California v. Iwasaki, supra; St. Charles National Bank v. Ford,* 39 Ill. App.3d 291, 349 N.E.2d 430 (1976); *Investment Service Co. v. Allied Equities Corp.,* 519 F.2d 508 (9th Cir. 1975) (applying Oregon law); *St. Petersburg Bank & Trust Co. v. Boutin,* 445 F.2d 1028 (5th Cir. 1971); *see, Watkins Products, Inc. v. Stadel,* 214 N.W.2d 368 (N.D. 1973) (following *Sumitomo, supra*); and *Andrus Zion's First National Bank of Ogden,* 99 Idaho 724, 588 P.2d 452 (1978).

## IV.

We next address under what circumstances a surety will be entitled to avoid his contractual obligation because the creditor made assertions which the surety later discovers are false. In *Brillion Lumber Co. v. Barnard,* 131 Wis. 284, 111 N.W. 483 (1907), one of the defendants acted as a surety for another defendant who had entered into a contract to perform services for the plaintiff lumber company. The principal obligor embezzled an amount for which the lumber company sought repayment from the surety. It was contended that the surety inquired as to the state of the principal obligor's account and that the lumber company in response stated that the account between it and the principal debtor was correct and the services rendered up to that time had been satisfactory. As it turned out, the principal debtor was in the process of misappropriating the lumber company's funds when the statements were made by the company to the surety. The court, reviewing earlier decisions, concluded that more than "mere innocent misrepresentation," that is, misrepresentation through ordinary negligence or the expression of an opinion, is necessary to constitute fraud "equivalent to actual fraud so as to discharge a surety."[6] It therefore held that the surety

---

[6] The court went on to elaborate on the principle announced in that case:

"It may be stated as a rule that upon the proposed obligee in a surety bond being applied to for information by the proposed surety as to the previous conduct of the proposed principal obligor, it is his duty to make full disclosure of all material facts within his knowledge bearing on the risk, and if he fails to do so, or knowingly makes, in response to the inquiry, false representations as to such facts or ignorantly does so, but under such circumstances as would naturally lead the inquirer to believe the representations to be based on an investigation, as, for instance, representations by a director of a bank charged with the duty of investigating the accounts of its cashier, and the proposed sure-

did not put forth a good defense based on fraud in obtaining the bond.

The reasoning in *Brillion* is not in accord with modern legal thought as reflected in more recent pronouncements by this Court. The most innocent misrepresentation may result in unforeseen liability to a likewise innocent surety. In circumstances such as these, where both parties, the misrepresenter and the surety, are innocent of any wrongdoing there is a dilemma as to the proper treatment to be accorded each. But between two innocent parties, the party making the misrepresentation will bear the loss. There is a basic inequity of allowing one party to benefit from his own misstatements or misrepresentations, however honestly he believed them to be at the time made. D. Dobbs, *Law Of Remedies*, §9.4 (1973).

In *Schnuth v. Harrison,* 44 Wis.2d 326, 337, 171 N.W. 2d 370 (1969), an action was brought by the purchaser of a business to rescind the contract and recover all money paid by him pursuant to the contract, based on the seller's misrepresentation. This court held that misrepresentation could form the basis for contract rescission, even if that misrepresentation was innocently made. Quoting from 5 S. Williston, *Contracts,* §1500, pp. 4189– 4191 (rev. ed. 1937), it was stated:

" 'It is not necessary, in order that a contract may be rescinded for fraud or misrepresentation, that the party

ty is induced thereby to sign the bond, he may avoid liability thereon on the ground of fraud; yet an innocent false representation under the circumstances stated, which is the assertion of a mere opinion or the existence of a fact not derived from investigation or made under such circumstances as to suggest such derivation but entertained and made through mere ordinary negligence, is immaterial. Applying that here, we reach the conclusion that the claim of fraud in obtaining the bond was not sustained by the evidence." *Brillion Lumber Co. v. Barnard,* 131 Wis. at 295.

making the misrepresentation should have known that it was false. Innocent misrepresentation is sufficient, for though the representation may have been made innocently, it would be unjust to allow one who has made false representations, even innocently, to retain the fruits of a bargain induced by such representations. This is often called a doctrine of courts of equity as distinguished from courts of law, and doubtless in its origin it was such; but, at the present time, it is rather a distinction between a right of rescission on the one hand whether that right is asserted in a court of equity, in a court of law, or without the aid of a court, and an action for damages on the other hand.'" *Schnuth v. Harrison,* 44 Wis.2d at 337–338.

The trial court's judgment granting the purchaser rescission was affirmed, this court holding that no reversible error occurred in the trial court's finding of material misrepresentation. *See also, Whipp v. Iverson, supra; McKearn v. Lerman Tire Service, Ltd.,* 32 Wis.2d 329, 336, 145 N.W.2d 731 (1966).

■
The character and extent of a misrepresentation which will allow rescission by a surety should accord with general contract principles. We therefore adopt the position taken in the Restatement (Second) of *Contracts,* §306 (1) (Tent. Draft No. 11, 1976) to determine when a contract will be deemed voidable and subject to rescission by one of the parties. That section provides:

"§306. **When A Misrepresentation Makes A Contract Voidable.** (1) When a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party, the contract is voidable by the recipient if he is justified in relying on the misrepresentation."

A misrepresentation is an assertion that does not accord with facts as they exist. Restatement (Second) of *Contracts,* §301 (Tent. Draft No. 11, 1976). A misrepre-

sentation is material if it is likely to induce a reasonable person to manifest his assent, or if the maker knows that it is likely that the recipient will be induced to manifest his assent by the misrepresentation. Restatement (Second) of *Contracts,* §304(2) (Tent. Draft No. 11, 1976).[7] Therefore, two separate standards must be viewed to determine whether the misrepresentation is material. The reasonable person standard is objective. The trier of fact must determine whether a reasonable person would be likely to assent to the contract on the basis of the misrepresentation. Secondly, even when under the reasonable person standard the misrepresentation would not have been material, it is possible that there were personal considerations which would induce the recipient to enter the contract. If the party making the misrepresentation knows of these special circumstances, the misrepresentation may be material even though it would not be expected to induce a reasonable person to enter the proposed contract. Restatement (Second) of *Contracts,* §304, Comment c. (Tent. Draft No. 11, 1976).

---

[7] That section provides:

"A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."

The parties agree that no actual fraud in the sense that First National intended to deceive Mr. Notte occurred in this case. If there is fraud, there is no requirement that the misrepresentation be material. Restatement (Second) of *Contracts,* §304(1) (Tent. Draft No. 11, 1976) provides:

"A misrepresentation is fraudulent if the maker intends thereby to induce a party to manifest his assent and the maker

"(a) knows or believes that his assertion is not in accord with existing facts, or

"(b) does not have the confidence in the truth of his assertion that he states or implies, or

"(c) knows that he does not have the basis for his assertion that he states or implies."

There has been considerable discussion in the parties' briefs concerning the justifiable reliance of Mr. Notte and his alleged negligence in failing to discover the facts behind the misrepresentations made. The recipient's fault in failing to discover the facts before entering the contract does not make his reliance unjustified unless his fault amounts to a failure to act in good faith or to conform his conduct to reasonable standards of fair dealing. Restatement (Second) of *Contracts,* §314 (Tent. Draft No. 11, 1976).

## V.

Application of the foregoing principles to the facts of this case requires that the case be remanded for a new trial. The submission to the jury of this case based on the theories of negligent and intentional misrepresentation in tort was erroneous. The defendant's proposed instructions and verdict based on a theory of strict responsibility were likewise not in accordance with applicable law.

The potentially significant nondisclosure concerns the bank's failure to inform Mr. Notte more fully of the credit history of Ms. McCloud upon inquiry by him. The scope of the inquiry may have been sufficiently narrow such that Mr. Bruett's answer was adequate. However, we cannot make this determination as a matter of law on the record before us. Likewise, the reference on the face of the note to the existence of a lien on real estate was a misrepresentation. Although it was the intent of First National to take a third mortgage when the papers were drafted, the bank later withdrew this requirement before Mr. Notte entered into the obligation. Again, we conclude that whether the misrepresentation was material, and whether the other elements for contract avoid-

ance were met were questions for the jury. Another factor affecting this determination would be the fact that the note recited that the proceeds would be for the Tartan Room, when in fact part of the proceeds were used to pay off a prior loan issued by First National. Further, the bank may be able to show that no harm resulted because the prior loan was to be used for fixtures as well. However, because the proper theory of the case was not advanced at trial, it is impossible to determine how the trial strategy and evidence introduced would have differed and how this would affect the outcome of the trial.

We therefore exercise our discretion and remand the case for a new trial. It is our conclusion that the interests of justice demand a new trial because the real controversy has yet to be fully tried. *Clark v. Leisure Vehicles, Inc.*, 96 Wis.2d 607, 292 N.W.2d 630 (1980); *Gyldenvand v. Schroeder*, 90 Wis.2d 690, 700, 280 N.W. 2d 235 (1979); *Weber v. John Hancock Mut. Life Ins. Co.*, 267 Wis. 647, 658–659, 66 N.W.2d 672 (1954); *Lowe v. Cheese Makers Mut. Casualty Co.*, 265 Wis. 365, 368, 61 N.W.2d 317 (1953); Sec. 751.06, Stats. (1977).

If the grounds for avoidance of the contract have been met, the remedy is clear. The aggrieved party has the election of either rescission or affirming the contract and seeking damages. Mr. Notte in this case has sought relief from his obligation under the contract. When rescission is sought each party is to return to the other such benefits as have been received from the other. *Seidling v. Unichem, Inc.*, 52 Wis.2d 552, 557, 191 N.W.2d 205 (1971); *Schnuth v. Harrison*, 44 Wis.2d 326, 337, 171 N.W.2d 370 (1969). If Mr. Notte can establish on retrial of the case, misrepresentation or nondisclosure under the above mentioned rules, he will be entitled to receive back payments he has previously made under the contract. It is true that the *status quo* cannot be restored by

granting rescission in this case. If granted, rescission will require the creditor to bear the loss even though the misrepresentations may have been innocent.[8]

Because we conclude that the trial proceeded upon an improper theory, and based on the manifest need for a new trial, we do not reach the other issues raised by the parties.

*By the Court.*—The decision of the court of appeals reversing the judgment of the circuit court and ordering the complaint dismissed and restitution paid is reversed and cause remanded for a new trial.

---

[8] *Compare,* Restatement, *Contracts,* §486 (1932).