Argued November 9, 1973, affirmed May 2, petition
for rehearing denied June 25, 1974

# EQUITABLE SAVINGS & LOAN ASSOCIATION,
*Respondent, v.* JONES ET AL, *Appellants.*

522 P2d 217

*Leo Levenson,* Portland, argued the cause for appellants. With him on the briefs were Ben Day, and Day & Brian, Medford.

*John R. Faust, Jr.,* Portland, argued the cause for respondent. With him on the brief were Cake, Hardy, Buttler, McEwen & Weiss, Portland; and Carl M. Brophy, and Brophy, Wilson & Duhaime, Medford.

Before O'CONNELL, Chief Justice, and DENECKE, HOLMAN, TONGUE, HOWELL, and BRYSON, Justices.

HOLMAN, J.

Plaintiff sought a judgment on the note of the defendants Kocsis and O'Neill upon which the unpaid balance was approximately $121,000, as well as the foreclosure of a mortgage on the real property of Mr. and Mrs. Jones (Jones) and Mr. and Mrs. Whittle (Whittle) which was security for the payment of the note. No personal judgment was requested against Kocsis and O'Neill for any deficiency that remained on the note after the application of the proceeds from the sale of the mortgaged property. Defendants Jones and Whittle appealed from a decree foreclosing the mortgage upon the real property.

Jones and Whittle were the owners of real property which they leased for a long term to a corporation called Imperial '400' National, Inc. The corporation built a motel upon the leased property with borrowed money to which obligation Jones and Whittle subordinated their fee. The corporation subsequently went into reorganization under Chapter X of the Bankruptcy Act. The federal court appointed the defendant O'Neill as the trustee to manage the affairs of the corporation during reorganization. O'Neill entered into a partnership agreement with Kocsis under which Kocsis was to manage the motel in return for a partial

interest in the motel. New financing was necessary to secure working capital and plaintiff loaned $135,000 to O'Neill and Kocsis on their note. O'Neill, Kocsis, Jones and Whittle all signed the mortgage on the motel property to secure the payment of the loan. Jones and Whittle did not sign the note. The balance on the original note by which money was raised to build the motel was paid off and the remainder of the funds secured from plaintiff was used as operating capital by O'Neill and Kocsis.

The operation of the motel again fell upon evil days and plaintiff sought to foreclose its mortgage. It petitioned the federal court for permission to foreclose the mortgage, offering not to ask for a judgment against O'Neill or Kocsis in excess of the amount the mortgaged property brought on foreclosure. The federal court granted permission to foreclose, but only on the basis that plaintiff seek no judgment against O'Neill or Kocsis in excess of the amount the mortgaged property would bring. No notice of the proceeding before the federal court to secure permission to foreclose the mortgage was given to Jones or Whittle.

## I.

The defendants Jones and Whittle contend that when they mortgaged their property to secure the obligation of O'Neill and Kocsis they became sureties, not primary obligors.[1] Plaintiff does not contest this premise.

■ Defendants also contend that their property was released from the lien of the mortgage and their obli-

---

[1] *See* Cross et al v. Allen, 141 US 528, 12 S Ct 67, 35 L Ed 843 (1891); Denny v. Seeley, 34 Or 364, 366, 55 P 976 (1899); Gray v. Holland, 9 Or 512 (1881).

gation as sureties was discharged because the promise of the debtors (the principals) was modified by plaintiff (the creditor) without defendants' (the sureties') consent in that plaintiff agreed with the federal court that O'Neill and Kocsis would be relieved of the payment of that part of their note over and above the sum which the mortgaged property would bring upon foreclosure. Plaintiff's position, on the other hand, is that defendants were not discharged by their agreement not to seek a deficiency because Jones and Whittle were sureties only to the extent of the value of their property, and the part of the debt that was forgiven was that part which was in excess of the value of that property, and which excess they had not promised to pay. Therefore, plaintiff claims, defendants suffered no detriment or change in circumstances by the modification of the obligation of O'Neill and Kocsis.

Jones and Whittle rely on the rule of *strictissimi juris* which provides that a surety is discharged by any alteration of the contract between the principal and the creditor whom he assures whether the change is material or not.[2] The modern rule requires that the alteration be material.[3] What constitutes a material alteration is probably best cast in the following statement:[4]

"* * * Probably what is meant is that an unauthorized alteration in the contract will release the surety where it changes the nature of the con-

[2] *See, e.g.,* Becker v. Faber, 280 NY 146, 19 NE2d 997, 999 (1939). See 50 Am Jur 939, Suretyship § 50 (1944).

[3] *See* Wehrung v. Denham, 42 Or 386, 391-93, 71 P 133 (1903). Stearns, The Law of Suretyship 109, § 6.3 (Elder Rev 1951); Simpson on Suretyship 329-31, § 72 (1950).

[4] 50 Am Jur 939, Suretyship § 50 (1944).

tract, thus changing the real meaning and legal import of the surety's obligation and placing him in a position different from that which he occupied before it was made \* \* \*." (Footnotes omitted.)

However, even this rule is generally further qualified in the case of a compensated surety.[5] Presently, a compensated surety is usually not discharged unless the change is detrimental to the surety, either actually or potentially.[6] Between a compensated surety and a gratuitous surety lie many situations in which the surety is not compensated but neither is he acting as such for the sole purpose of helping another. The present situation is one of this hybrid nature in which the defendants originally subordinated their property to induce a loan which would make possible increased rental from the developed land. Having once subordinated their property they were in a position where it was necessary to refinance or lose their property. In a situation where a surety's self-interest is of this proportion, it does not seem reasonable or equitable to release the surety from his obligation because of an unconsented-to change in the principal's obligation, even though material, unless the change is actually or potentially detrimental to the surety.[7]

---

[5] A compensated surety has generally been interpreted to mean a surety company, *i.e.,* one whose business is insuring certain risks for a premium. See Stearns, *supra* note 3 at § 5.1; Restatement of the Law of Security 233-34, § 82, comment *i* (1941).

[6] Simpson, *supra* note 3 at 347-48, § 72; Restatement of the Law of Security 340, § 128 (b) (1941).

[7] *See* Wehrung v. Denham, *supra* note 3 at 392-93; United Concrete Pipe Corp. v. Spin-Line Co., 430 SW2d 360, 366 (Tex 1968). *See generally,* Annotation, 121 ALR 1014 (1939); Restatement of the Law of Security 340, § 128 (1941). Simpson, *supra* note 3 at 330, § 72; Stearns, *supra* note 3 at 127, § 6.12; 10 Williston on Contracts 776, § 1243 (3d ed. Jaeger 1967).

## II.

Before examining the present circumstances for the purpose of determining whether the release of the principals, O'Neill and Kocsis, from any deficiency was actually or potentially detrimental to the defendants' position as sureties, another aspect of the law of suretyship must be considered. This aspect of the law is encompassed within the Restatement of the Law of Security, as follows:[8]

"Where the creditor releases a principal, the surety is discharged, unless

"\* \* \* \* \*

"(b) the creditor in the release reserves his rights against the surety."

The rationale of this rule is stated in the Restatement, as follows:[9]

"Where the creditor releases the principal but reserves his rights against the surety, this is construed as a covenant not to sue the principal. Historically, the covenant not to sue did not prevent a suit in violation of the covenant, although a liability might be incurred by such a suit. The creditor, by a release with reservation of rights against the surety, was in effect notifying the principal that, in spite of the release, the surety might pay as the result of compulsion or voluntarily and that the principal would then be liable to reimburse the surety. Since the release was regarded as only a covenant not to sue, even the surety's right of subrogation was technically preserved. The reservation of rights showed that the creditor had no intention to release the surety. The principal had no cause for complaint since, having accepted his

---

[8] Restatement of the Law of Security § 122 (1941).

[9] *Id.* at 324, comment *d.*

release with the reservation, he necessarily accepted the consequence that the liability might still be enforced against him through action by the surety."

Certainly, the motion for and the order received from the federal court would, under Section 122 of the Restatement, be treated as a release of part of the obligation of O'Neill and Kocsis with a retention of full rights against the sureties Jones and Whittle.

However, the rule of Section 122 is seemingly contrary to the zealous protection which the law affords sureties by means of the rule that any material change in the status of the principal's obligation releases the surety, especially if the change is at least potentially detrimental to the surety.[10] This conflict has resulted in criticism of continuing to hold the surety by the means of analogizing a reservation of the creditor's rights against the surety to that of a covenant not to sue the principal,[11] although the application of such an analogy is almost universal.[12]

Arant, in his treatise, has the following to say:[13]

"* * * The fallacy of the reasoning by which the surety is held liable under such circumstances resides in the assumption that there is no reason which requires the surety's discharge so long as the creditor's act does not destroy his right to sue the principal in the creditor's name in the law

---

[10] Note, 50 Yale L J 1485, 1489 (1941).

[11] Simpson, *supra* note 3 at 302-04, § 64. *See generally,* Annotation, Reserving Rights Against Surety, 139 ALR 85 (1942). *Cf.* Gholson v. Savin, 137 Ohio St 551, 31 NE2d 858 (1941) (Zimmerman, J., dissenting).

[12] *See, e.g.,* Meyn v. Schutte, 20 Misc 2d 471, 186 NYS2d 965 (Sup Ct 1959). *See generally,* Note, 50 Yale L J 1485 (1941).

[13] Arant on Suretyship 185, § 50 (1931). *See also* Simpson, *supra* note 3 at 303, § 64.

courts. It also assumes that the creditor has the power to surrender his privilege of proceeding against the principal and preserve unimpaired his claim against the surety. If this is so, the creditor can at will change the risk borne by the surety. When the surety contracts, he assumes the risk of having to pay the debt if it is not paid by his principal, but he contemplates that his principal shall continue to have all the compulsion to perform that his undertaking originally placed upon him. By the creditor's release, whether with or without reservation of rights against sureties, some of this compulsion is removed, and the creditor thereby makes it certain that the principal, who was originally expected by all parties to perform as he agreed, will not do so. To hold the surety liable under such circumstances is unjust, because it imposes upon him a wholly different risk from that which he intended to assume."

The principals' contract with the creditor was to pay a balance of $121,000. The payment of this sum was secured by the sureties to the extent of the value of their mortgaged land. Upon the principals' being told by the creditor that no judgment would be taken against them for any amount which was owing in excess of the value of the land, the principals were relieved of any possibility that their immediate loss upon foreclosure would be more than their equity in the motel, if any such equity existed. In such a situation, the principals' ultimate decision could not help but be affected, by the fact that no judgment for a deficiency would be taken against them, when considering whether they should attempt to refinance the venture again or to commit to it other assets that might be available to them. By thus changing the obligation of O'Neill and Kocsis the possibility that they would continue their efforts to comply with their promise to repay their

note was materially lessened, because the detrimental effect upon them of non-payment had been substantially alleviated when they were relieved of the possibility of a deficiency judgment.[14] The extent of any compulsion upon O'Neill and Kocsis to pay which existed at the time defendants undertook to become sureties was materially lessened, and thus there would be imposed upon defendants a different risk than that which they intended to assume.

Plaintiff's contention is similar to that found in *Becker v. Faber*,[15] a case involving a reduction of interest, and leniency in demanding payment by the creditor, wherein the New York Court of Appeals stated a rule as to when changes in the contract between debtor and creditor would discharge the surety:[16]

> "In this case the surety claims that unqualified benefit bestowed upon the principal debtor and leniency and consideration shown to the principal debtor discharges the surety. That is not the law of this State. The surety guaranteed the performance of the obligation of the principal debtor. The creditor's agreement to forego part of his rights does not discharge the surety from responsibility for failure of performance by the principal debtor of that part of the original obligation which still remains and *which remains untouched and unaffected by the creditor's remission of the remainder of the obligation.* The surety is held to no obligation which he did not assume and if the surety meets that obligation he will be subrogated to the creditor's cause of action against the principal debtor, in accordance with the terms of the original contract." (Emphasis in original.)

---

[14] Cf. Note, 50 Yale L J 1485, 1489-490 (1941).

[15] 280 NY 146, 19 NE2d 997 (1939).

[16] Becker v. Faber, 280 NY 146, 19 NE2d 997, 1000, 121 ALR 1010 (1939).

Plaintiff Equitable claims essentially that the duty of the sureties was to assure payment of the part of the obligation existing before any deficiency judgment. Therefore, the obligation of the sureties was "untouched and unaffected by the creditor's remission of the remainder of the obligation," *i.e.*, the deficiency judgment. This position is untenable in the case at bar for two reasons. First, the deficiency judgment is not like a proportionate remission. Such a remission would reduce the surety's potential liability *pro tanto*. The loss of a right to a deficiency, however, would not. It is a remedy of the creditor to enable him to collect the entire debt owed. It is therefore a remedy to which a surety would be subrogated upon payment. It follows that its loss would be an impairment of the surety's right of subrogation. Second, and more important, the detriment to the sureties in this case is found not in simple monetary terms, but in the effect such a waiver may have on the economic compulsion on the principal debtor to continue to work to pay off his debts. Unlike the remission of a right to a deficiency, after a proportionate remission a debtor would be just as likely to fulfill his promises and, indeed, more able to fulfill them. Therefore, the surety's risk of loss is reduced. However, when a right to a personal deficiency decree is foregone, it reduces the economic compulsion on a debtor to pay because it is a remission of that part of the debtor's obligation which he may possibly have to pay out of any non-mortgaged assets he may own.

■ We feel compelled to swim against the usual stream of adjudicated cases and to hold that a reservation of rights by the creditor against the surety is insufficient, without statutory authority, to hold the surety to his obligation if the alteration is actually or

potentially detrimental to the surety. This means that in the absence of any further factor, Jones and Whittle would be released of their obligation as sureties to plaintiff because plaintiff made a material change, without the sureties' consent, in the obligation of O'Neill and Kocsis which was potentially detrimental to Jones and Whittle.[⑰] However, there is another factor which does affect the outcome.

## III.

█ A variation of the principal's contract or of its performance which has been consented to by the creditor to the detriment of the surety does not discharge the surety if such variation measures up to the standard of ordinary business prudence on the part of the creditor or should have been anticipated by the surety as a possibility under the circumstances.[⑱] At the time the loan was made, Imperial '400' National, Inc., was in reorganization under Chapter X of the Bankruptcy Act and the loan was made to the trustee in reorganization. The order issued by the federal court approving the petition for reorganization contains the usual language prohibiting until further order all persons from doing any act or commencing any proceeding which would interfere with the trustee's possession of the property of Imperial '400' National, Inc. This order was in effect at the time of the signing of the mortgage by Jones and Whittle by which they mortgaged their interest in property in the possession of the trustee for a debt of the trustee who was under the federal court's protection. If, under such circum-

---

[⑰] Cf. Restatement of the Law of Security 340-41, § 128 (1941).

[⑱] Simpson, *supra* note 3 at 345, § 72; Williston, *supra* note 7 at 775, § 1242. *Cf.* Arant, *Why Release of Security Discharges Surety,* 14 Minn L Rev 725, 739-40 (1930).

stances, ordinary business prudence indicated that a creditor foreclosing a mortgage on property securing the debt which was in the possession of the trustee would be required to sue with the consent of and under such conditions as would be imposed by the federal court, it must be said that it should have been anticipated by the surety that the possibility existed that concessions in favor of the trustee might be made by the mortgagee or imposed by the court.

In a Chapter X reorganization, there will normally be a stay of all pending actions against the debtor corporation. Upon approval of a petition to reorganize under Chapter X, an automatic stay is effected. 11 USCA § 548 (Ch X, § 148) provides:

> "Until otherwise ordered by the judge, an order approving a petition shall operate as a stay of a prior pending bankruptcy, mortgage foreclosure, or equity receivership proceeding, and of any act or other proceeding to enforce a lien against the debtor's property."

It is not clear whether the automatic stay affects subsequent suits against the trustee. Collier indicates that it does because "[t]here is no compelling reason why the commencement of actions to enforce liens after the approval of a petition should not be covered * * *."[*] However, 11 USCA § 516 (4) (Ch X, § 116 (4)) also grants the power to

> "* * * enjoin or stay until final decree the commencement or continuation of a suit against the debtor or its trustee or any act or proceeding to enforce a lien upon the property of the debtor."

Thus, it seems clear that the federal court could have enjoined the commencement of any lien fore-

---

[*] 6 Collier on Bankruptcy 1065, ¶ 6.12 n 15 (Moore ed 1972).

closure suits commenced without its permission. The problem in the case arises because of a separate statute authorizing suits against trustees without leave of the court appointing them. 28 USCA § 959 (a) provides:

> "Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury."

While it appears from the face of the statute that a trustee giving a mortgage in continuing a business in reorganization under Chapter X could be sued without leave of the federal court, the rule is apparently otherwise where title or possession of property held by the receiver or trustee is involved.[20] The leading bankruptcy treatise[21] states the rule to be that,

> "Leave of the appointing court is also necessary where the suit involves title to or possession of the property held by the receiver or trustee."

■ The reason for this exception appears to be that suits in other jurisdictions which do not directly affect interests in property may be pursued because no property of the debtor will be directly affected until a levy is executed on the judgment. At that time, the claimant must come before the reorganization court. Where a suit directly affects interests in property, however, the ability of the reorganization court to pursue its appointed tasks successfully is threatened. Without

[20] *See discussion in* McGreavey v. Straw, 90 NH 130, 5 A2d 270 (1939).

[21] 6 Collier on Bankruptcy 249, ¶ 2.36 (Moore ed. 1972). *Also see id.* at 479, ¶ 3.09; 646-51, ¶ 3.31.

its consent, a debtor could be dismembered; therefore, suits affecting property interests must be by leave of the reorganization court.[22]

■ The power of the reorganization court to protect the debtor's property is implemented by granting to the court exclusive jurisdiction over property of a debtor wherever located.[23] The court in this case not only had exclusive jurisdiction over the debtor's property, but implemented that jurisdiction by issuing a stay of all proceedings against the debtor corporation's property. There are two reported cases involving Imperial[24] where the stay granted was in question. While neither of those cases specifically involves 28 USCA § 959 permitting suits without leave of court, it is clear from both that the control of all motel properties is so vital to the successful reorganization of Imperial that a suit in state or federal court affecting title or possession would be enjoined.[25]

■ Whether it was necessary to seek leave of the reorganization court because of its exclusive jurisdiction of property, or because the suit had been or would be enjoined, it is clear that Equitable would have to submit to the jurisdiction of that court in order to foreclose its mortgage. In *Diners Club, Inc. v. Bumb,*[26] the contention was made that 28 USC § 959 (a) granted plaintiff an absolute right to sue the

---

[22] *See* Thompson v. Texas Mexican Ry. Co., 328 US 134, 140-41, 66 S Ct 937, 90 L Ed 1132, 1136-137 (1946).

[23] 11 USCA § 511; In re Imperial '400' National, Inc., 429 F2d 680, 682 (3d Cir 1970).

[24] In re Imperial '400' National, Inc., 429 F2d 671, 674 (3d Cir 1970); In re Imperial '400' National, Inc., 429 F2d 680 (3d Cir 1970).

[25] *See* 429 F2d at 678-79, 682-83.

[26] 421 F2d 396 (9th Cir 1970).

trustee because the cause of action arose out of a breach of contract by the trustee in carrying on the business of the debtor. The court stated as follows:[*]

> "If the first sentence of the statute stood alone, we might be persuaded, since appellant's suit clearly was in respect of the Trustee's transactions in carrying on the debtor's business. [Citations.] But the first sentence's broad grant of permission to sue is limited by the second, which makes suits subject to the general equity power of the appointing court. We are of opinion that this proviso, considered in the light of the legislative history of § 959 (a), is sufficient to refute appellant's contention." (Footnotes omitted.)

■ There is a distinction between contracts of suretyship in ordinary business affairs and those connected with judicial proceedings. A surety's continued liability is justified whenever he obligates himself for the performance of an action which is dependent on judicial proceedings because his liability is assumed with reference to the power of the court to do those things which are within the scope of its authority. *Clark v. Dreyer,* 9 Colo App 453, 48 P 818 (1897); *Weingarten v. Kramer,* 139 Misc 74, 247 NYS 657 (City Ct NY 1931); *The People v. Vilas,* 36 NY 459, 93 Am Dec 520 (1867); *Jamieson v. Capron,* 95 Pa 15 (1880).

■ In the case of a reorganization trustee, the principal is a judicial officer who is continuing the ordinary business affairs of a debtor. Thus, the elements of business surety and judicial surety are indivisibly intermingled. Therefore, one who stands as surety for a business obligation of a reorganization trustee may be held to his obligation though the court may make alterations which materially increase the surety's risk.

---

[*] *Id.* at 398.

■ There must be, however, some limit to the changes that can be made without, discharging the surety. Risks should not be imposed upon the surety which are wholly and completely different from those which he expected to assume. The surety should be held only if the alterations judicially made are such that are normally expected in the type of judicial proceeding in question. In this case we have a reorganization under Chapter X. The court is the protector of the property of the debtor with a view to getting the debtor back on its feet. Therefore, alterations which require a creditor to give something up in order to recover on its debt may well be required by such a court. If such alterations have effects on parties other than a creditor, such effects are to be expected by those who assure obligations of a debtor in reorganization.

That a court may, in allowing alterations, materially increase the risk of a surety is clear from the case of *Hocker v. Woods's Executor*, 33 Pa 466 (1859). There a surety had bound himself for joint principals, *i.e.*, two guardians. The court, however, released one principal. Such a release of one of several principals would normally discharge the surety.[69] However, the surety is held to have contracted with a view to the possible exercise of the inherent power of a court to discharge its officers and agents. Therefore, the surety was not discharged. Similarly, it is an inherent power of a reorganization court to protect property of a debtor. Therefore, conditions placed on permission to sue or levy against such property may be expected, and should be held to have been expected here.

---

[69] Simpson on Suretyship 298, § 63 (1950).

When O'Neill signed the note and mortgage as "Trustee under Ch X," Jones and Whittle were put on notice that plaintiff would have to seek leave of the court to pursue any property within the possession of the trustee which was given as security for the payment of the note. They therefore may be held to some knowledge that the reorganization court might permit the creditor's remedies on conditions somewhat inimical to the right of the sureties.

It can be argued that plaintiff did not treat the sureties fairly because they were not informed of the application which was being made to the federal court to foreclose the mortgage and because plaintiff originally proposed in its petition the giving up of the deficiency judgment against the trustee and his partner, Kocsis. Be that as it may, the ultimate authority to restrain the foreclosure or to permit it upon such conditions as the court would specify lay with the federal court. We hold that the making of such an application and the bargaining with the court by the creditor were the chances Jones and Whittle took when they became sureties for the debt of a trustee in reorganization by mortgaging their interest in property which was in the exclusive possession of the court and necessary to the kind of business which the court was reorganizing.

The decree of the trial court is affirmed.