[No. 12992-9-I. Division One. September 23, 1985.]

PEOPLES NATIONAL BANK OF WASHINGTON, *Respondent*, v.
FREDERIC S. TAYLOR, ET AL, *Appellants.*

*Van Valin & Watts* and *Charles Watts,* for appellants.

*Karr, Tuttle, Koch, Campbell, Mawer & Morrow, P.S., James L. Austin, Jr.,* and *Philip A. Talmadge,* for respondent.

COLEMAN, J.—Frederic S. Taylor appeals from a judgment entered against him on his written guaranty of a portion of Allan B. Whitehill's obligation to Peoples National

Bank of Washington. Taylor assigns error to several find-ings of fact and conclusions of law, arguing that they are not supported by substantial evidence and are legally incorrect. Taylor's essential argument is that the Bank failed to disclose to him and to his agent facts which were material to his decision to undertake the guaranty.

## FACTS

The majority of the facts are undisputed. In 1978, Fre-deric Taylor, an anesthesiologist practicing in Seattle, was the owner of a 1935 45–foot wood sailboat, the *Copernicus*. Taylor had purchased the *Copernicus* with a loan from Peoples National Bank secured by a preferred marine mortgage against the vessel. For several years prior to 1978, Susan Stephens Whitehead, who at the time operated her own financial and investment planning service, had been Taylor's financial advisor. In the late summer of 1978, Tay-lor was unable to meet his marital community's debts, and he decided, on Whitehead's advice, to sell the *Copernicus* as part of a payment plan to eliminate the community debts. Taylor listed the *Copernicus* with Heddy–Jensen, a local marine brokerage, in mid–November 1978.

Within a few weeks after the *Copernicus* was listed, Allan Whitehill appeared as an interested buyer. Heddy–Jensen referred Whitehill to the Bank for assistance in financing the purchase of the vessel. Eventually, Taylor and Whitehill agreed on a total price of $75,888 (purchase price plus sales tax). On or about November 24, 1978, Whitehill applied for a loan of $55,888 from the Bank. Whitehill told the Bank that he would obtain the remaining $20,000 from the sale of his residence in East Wenatchee, Washington. In early December 1978, a loan officer contacted the Wenat-chee real estate brokerage firm with which Whitehill had listed his home and determined, among other facts, that the house was expected to sell shortly and that the proceeds of a cash sale of the property were anticipated to generate almost $29,000, more than enough equity to cover the $20,000 gap between the loan and the purchase price of the

vessel.

The Bank also obtained a credit report on Whitehill. Whitehill's rating on his debt was the highest obtainable, but on two of his accounts (apparently business related), his creditors indicated that payments after June 1978 were 30 to 60 days behind schedule. The Bank did not consider this to be a negative credit factor, as it viewed lateness on trade accounts to be fairly common for businesses. After reviewing these facts, the Bank decided to decline Whitehill's application because the payments he would be required to make on the boat and moorage loan would be a larger percentage of his income than the Bank's usual schedule for such loan payments.

Due to Taylor's default on the loan secured by the *Copernicus*, the community's various loans had been transferred to the Bank's claims department and assigned to Jeffrey W. Jorgensen. Jorgensen had the final authority as to whether a loan for the purchase of the *Copernicus* should be made to Whitehill. Jorgensen testified that a major concern of the Bank was that Whitehill was a new resident of Seattle and had been employed only a short time. However, Whitehead had indicated to Jorgensen that selling the *Copernicus* was an important part of Taylor's payment plan, and Jorgensen knew that no other prospective buyers had appeared yet.

Jorgensen concluded that the Bank would be willing to approve a loan to Whitehill if Taylor guaranteed part of the loan. Jorgensen discussed this possibility with Whitehead in a telephone conversation in early January 1979. After Whitehead related the conversation to Taylor, Taylor was reluctant to guarantee $17,000 of the loan. On January 18, 1979, Jorgensen, Whitehead, and Taylor met at the Bank's claims department to discuss the possibility of the guaranty. The testimony is conflicting regarding the content of Jorgensen's communications to Whitehead and Taylor at this meeting. The trial court accepted Jorgensen's testimony as more credible than Whitehead's and Taylor's version of the discussion at the meeting, finding of fact 14, and

Taylor does not challenge finding of fact 13, which summarizes the information Jorgensen communicated to Taylor and Whitehead.

The trial court found that during the 2–hour meeting, devoted mostly to the subject of the guaranty, Jorgensen told Taylor and Whitehead that Whitehill sought a loan for $55,888 from the Bank and that Whitehill intended to make a down payment of $20,000 from the sale of his home; that the percentage of Whitehill's income which would be devoted to loan payments exceeded the Bank's normal credit standards; that the Bank felt insecure about Whitehill as a credit risk because he had been living and working in Seattle only a short amount of time; that Heddy–Jensen had indicated that if the *Copernicus* had to be sold quickly, it could sell for about $50,000; and that the Bank would not be able to make a loan of $55,888 to Whitehill unless Taylor guaranteed $17,000 of the loan.[1]

At the January 18, 1979 meeting, Taylor signed a written guaranty for $17,000 limited to the proposed $55,888 loan to Whitehill, which was secured by the *Copernicus*. Taylor and Whitehead asked the Bank not to disclose the guaranty to Whitehill, fearing that Whitehill might be more inclined not to meet his obligation to the Bank if Whitehill knew that Taylor's credit was behind part of the loan. The Bank honored this request and approved the $55,888 loan.

Contrary to the Bank's expectation, Whitehill's home was not sold within a short period after the January 18, 1979

---

[1]Whitehead and Taylor testified that they believed Jorgensen told them Whitehill would be making a $20,000 down payment in *cash* from his own funds. In Taylor's appellate brief, however, he contends that the Bank and he mutually understood that the down payment would come from the sale of Whitehill's home. Taylor now argues that the sale of the home and the representation that cash would be paid from the sale were conditions to the guaranty. Reply Brief of Appellant, at 1.

Jorgensen testified that he recalled telling Taylor and Whitehead simply that Whitehill was making a $20,000 down payment on the boat, which "only meant to me that he had that much equity in the boat compared to the sale price that he was paying for it." At the time of the meeting on January 18, 1979, Jorgensen knew that the home had not been sold.

meeting. To enable Whitehill to utilize the equity in his home for the purchase of the *Copernicus,* the Bank agreed to make a "bridge" loan to Whitehill. Jorgensen testified that the North Seattle Branch of the Bank suggested the bridge loan first and that he indicated he would approve the transaction in order to finalize the loan on the vessel. Jorgensen stated that he felt the loan to Whitehill should be closed as soon as possible so that Taylor could begin paying the rest of his obligations. In a promissory note dated February 2, 1979, the Bank provided Whitehill with the bridge loan in the amount of $23,000, due in full on May 8, 1979. This loan was secured by a deed of trust against Whitehill's home, junior to a first mortgage held by another financial institution.[2] Twenty thousand dollars of the loan was applied to the purchase price of the *Copernicus,* and $3,000 was placed in a savings account at the North Seattle Branch to serve as collateral for the $55,888 loan guaranteed by Taylor.

Jorgensen did not disclose the bridge loan to Taylor or Whitehead, because, as he testified, "Dr. Taylor wasn't guaranteeing that second loan, so it didn't appear to me that there was any reason to give him the information. I wasn't trying to hide it from him, but it didn't occur to me that it was significant."

In short, the Bank treated Whitehill's purchase of the *Copernicus* as financed by two loans: (1) a 10–year installment loan in the amount of $55,888 (principal) secured by a preferred marine mortgage against the *Copernicus* and by Taylor's $17,000 guaranty; and (2) a $23,000 bridge loan secured by the equity in Whitehill's East Wenatchee home.

The Whitehill home still did not sell as quickly as expected; consequently, the Bank renewed the bridge loan four times during the next 13 months. Prior to March 25, 1980, the date of the fourth renewal, Whitehill sold the property to the Ulrichs, husband and wife, on a real estate

---

[2]The trial court found that the Bank reasonably believed the bridge loan to be fully secured by Whitehill's equity in his East Wenatchee home.

contract. The Ulrichs refinanced the Whitehill obligation to the Bank; thus, ultimately the bridge loan was fully satisfied.

Whitehill made timely payments on the $55,888 loan until November 1979 when his payments became sporadic, and he made none after November 5, 1980. Thereafter, the Bank unsuccessfully attempted to obtain payments from Whitehill on the $55,888 loan guaranteed by Taylor. On March 31, 1981, counsel for Taylor wrote to Jorgensen, requesting that the Bank commence an action to foreclose its preferred marine mortgage against the vessel. On or about June 3, 1981, the Bank filed an action in the United States District Court for the Western District of Washington against the *Copernicus,* Whitehill, and Taylor. A default judgment was entered in October 1981 against Whitehill and the *Copernicus.* The claims against Taylor were voluntarily dismissed.

On March 23, 1982, the Bank filed the present action against Taylor in King County Superior Court, seeking recovery on Taylor's guaranty. Part of Taylor's defense was that the Bank failed to disclose and misrepresented material facts which allegedly induced Taylor to make his guaranty. Following trial, the trial court entered extensive findings rejecting Taylor's defense and granting the Bank recovery on the $17,000 guaranty, with interest, attorney fees, and costs.

## ISSUES

1. Are the findings of fact to which error is assigned supported by substantial evidence?

2. If there is substantial evidence to support the findings, do the findings support the conclusions of law? Substantively stated, the issue is whether Peoples National Bank failed to disclose facts unknown to Taylor which materially affected the risk Taylor intended to undertake as surety on the $55,888 loan.

3. Does equity require application of payments made by Whitehill on the bridge loan to the $17,000 portion of the

loan guaranteed by Taylor?

4. Is Taylor or the Bank entitled to attorney fees on appeal?

When reviewing a trial court's findings of fact and conclusions of law, an appellate court is limited to determining whether substantial evidence supports the findings and, if so, whether the findings support the trial court's conclusions of law and judgment. *Rainier Nat'l Bank v. Clausing,* 34 Wn. App. 441, 444, 661 P.2d 1015 (1983) (citing *Ridgeview Properties v. Starbuck,* 96 Wn.2d 716, 638 P.2d 1231 (1982)). Substantial evidence is evidence in sufficient quantum to persuade a fair–minded person of the truth of the declared premise. *Nejin v. Seattle,* 40 Wn. App. 414, 419–20, 698 P.2d 615 (1985).

The findings which Taylor attacks are based on the testimony of Jorgensen, Taylor, and Whitehead. In finding of fact 14, which is not challenged, the trial court stated:

> Although the testimony of Jorgensen as to the discussion held in his office on January 18, 1979, diverges in certain particulars from the testimony of Taylor and Whitehead with respect to that discussion, the Court accepts Jorgensen's testimony in this respect, finding it to be more credible than that of Taylor and Whitehead.

Where the trial court's findings are based on conflicting testimony, an appellate court must determine only whether the evidence most favorable to the prevailing party supports the challenged findings, *State v. Black,* 100 Wn.2d 793, 802, 676 P.2d 963 (1984); in these circumstances, we will not substitute our judgment for that of the trial court. *Clausing,* at 444. A careful reading of the record reveals substantial evidence which would persuade a fair–minded person of the truth of the trial court's findings.

EVIDENCE SUPPORTING FINDINGS

We first briefly discuss the challenged findings and evidence supporting them.

Finding of fact 17: This finding states that the Bank "reasonably anticipated at the time the bridge loan was made to Whitehill that his East Wenatchee home would be

sold before the bridge loan came due . . ." (on May 8, 1979) and that the sale of the home would produce sufficient funds to satisfy all principal and interest on the bridge loan. Taylor contends that the evidence does not support this finding because the bridge loan occurred 2 months *after* the Bank received information from the real estate broker that Whitehill's home was likely to sell soon. Taylor does not, however, show how the finding of *reasonable anticipation* is erroneous. The finding is supported by Jorgensen's testimony.

Finding of fact 19: Taylor challenges the part of this finding stating that the $55,888 loan and the $23,000 bridge loan were treated as separate obligations by the Bank. Taylor contends that the Bank's records indicate that these loans were handled as connected transactions. However, Taylor has not submitted the Bank's records on the loans for our review. As the Bank observes, Jorgensen testified that the loans were separate. The trial court, weighing the testimony, found Jorgensen's characterization to be credible. The finding is supported by substantial evidence.

Findings of fact 23, 36, 37, 38, 41, 42, 43, and 45: Taylor contends that these findings are actually conclusions of law. To the extent that they are findings of fact, they are supported by substantial evidence, largely contained in Jorgensen's testimony. To the extent that the findings are conclusions of law, their validity is addressed below.

### DUTY TO DISCLOSE

█ The determinative legal issue in this case is whether the Bank violated a duty to disclose to Taylor details of the transactions surrounding his guaranty. Both parties cite the Restatement of Security § 124(1) (1941) for the rule regarding a creditor's duty to disclose material facts to a surety:

Where before the surety has undertaken his obligation [a] the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and [b] the creditor also has reason to believe that these

facts are unknown to the surety and [c] has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.

*See also Associated Indem. Corp. v. Del Guzzo,* 195 Wash. 486, 510, 81 P.2d 516 (1938) (quoting the rule in 21 R.C.L. *Principal and Surety* § 38, at 989, similar to the Restatement rule).

Comment *b* to the Restatement § 124(1) recognizes that

there is often considerable difficulty in ascertaining the precise degree of knowledge of surety and creditor and even in determining the materiality of the facts alleged to be concealed . . . [The rule] does not place any burden on the creditor to investigate for the surety's benefit. It does not require the creditor to take any unusual steps to assure himself that the surety is acquainted with facts which he may assume are known to both of them. . . . If the surety requests information, the creditor must disclose it. Where he realizes that the surety is acting or is about to act in reliance upon a mistaken belief about the principal in respect of a matter material to the surety's risk, he should afford the surety the benefit of his information if he has an opportunity to do so.

Every surety by the nature of his obligation undertakes risks which are the inevitable concomitants of the transactions involved. Circumstances of the transactions vary the risks which will be regarded as normal and contemplated by the surety.

When the creditor, rather than the debtor, solicits the surety, as the Bank solicited Taylor in this case, the creditor has a greater duty of disclosure "because the creditor may not then assume that the surety will acquire all material information from the debtor." *Sumitomo Bank v. Iwasaki,* 70 Cal. 2d 81, 89, 447 P.2d 956, 73 Cal. Rptr. 564, 570 (1968). If the circumstances warrant disclosure by the creditor and the creditor fails to disclose, the surety will be discharged, regardless of the creditor's intent in not disclosing. *First Nat'l Bank & Trust Co. v. Notte,* 97 Wis. 2d 207, 293 N.W.2d 530, 534 (1980).

In *Sumitomo,* 73 Cal Rptr. at 573, the California

Supreme Court construed § 124(1) as requiring proof on each of three factors (letters [a], [b], and [c] inserted in § 124(1), quoted above) to discharge a surety from liability; only if all three conditions are satisfied may a surety be discharged.[3] The *Sumitomo* court restated condition [a] as follows: the creditor must have "'reason to believe'" that the facts it knows about "materially increase the risk 'beyond that which the surety intends to assume'". *Sumitomo,* at 93. In *Sumitomo,* the record did not establish condition [a], *i.e.,* that the creditor had reason to believe that the debtors' inability to pay their federal taxes without a loan (a fact that the creditor knew) materially increased the risk beyond that which the surety intended to assume. There was no evidence describing the financial condition of the debtors at the time that the surety executed the guaranty. Thus, there was no evidence of the risk the surety intended to assume or whether the creditor had reason to know what risk the surety intended to assume. *Sumitomo,* 73 Cal Rptr. at 574. Consequently, the court remanded the case for retrial on the issue of the surety's liability on this particular loan. *Sumitomo,* 73 Cal Rptr. at 575.

In the present case, the established evidence similarly does not establish that the Bank had reason to believe that providing the bridge loan to Whitehill materially increased the risk Taylor intended to assume. Jorgensen testified that the Bank treated the loans as separate and distinct obligations and that he had no reason to believe that the bridge loan would have an impact on Taylor's guaranty. In fact, the Bank reasonably expected the bridge loan to be satisfied and eliminated with the sale of Whitehill's residence. Finding of fact 17. Once that sale was accomplished, the bridge loan was paid through the Ulrichs' refinancing arrangement. Furthermore, Jorgensen, as representative of the Bank, stated his belief that the bridge loan was not

---

[3]This construction applies to the initiation of the suretyship as well as to extensions of further credit by the surety. *Sumitomo Bank v. Iwasaki,* 70 Cal. 2d 81, 447 P.2d 956, 73 Cal. Rptr. 564, 571 (1968).

"significant" to Taylor's guaranty. Taylor has not demonstrated why, as a matter of law or fact, the bridge loan should have been significant to Taylor or how the Bank would have had reason to know about this alleged materiality.

Taylor asks this court to find that, at the time of executing the guaranty, the Bank should have disclosed the fact that the $20,000 was anticipated proceeds from the sale of Whitehill's home and that the home had not yet sold. In addition, Taylor contends that after the guaranty was signed the Bank should have revealed that it loaned Whitehill the amount of the down payment plus a $3,000 collateral savings account while waiting for the liquidated proceeds from the sale of the home. The testimony of Jorgensen, Whitehead, and Taylor suggests that Taylor and Whitehead assumed, without inquiring, that Jorgensen was talking about cash when he referred to Whitehill's $20,000 anticipated down payment. Although Taylor urges us to believe that the sale of the home and the existence of cash proceeds were conditions to the guaranty, there is no evidence to support this interpretation of the record. Taylor admits that he understood that the down payment would come from the sale of the home. See footnote 1. When the guaranty was executed on January 18, 1979, the down payment was not in cash because the home had not sold yet.

Significantly, the record discloses no inquiry by Taylor or Whitehead into the source of the down payment or Whitehill's financial stability, apart from the discussion that took place on January 18, 1979. Washington cases emphasize the surety's responsibility, at least in the case of compensated sureties, for inquiring about the risk he is about to undertake.[4] *See, e.g., Molin v. Anderson,* 118 Wash. 208, 210, 203

---

[4] A creditor may have a lesser burden of bringing facts to the notice of a compensated surety who is known to make careful investigations before taking any obligation than to a casual surety who relies more completely upon the appearances of a transaction.

Restatement of Security § 124, comment *b* at 329 (1941). The Bank argues that Taylor was a compensated surety because he benefited economically by the

P. 8 (1922) (it was the surety's privilege to inquire if it was interested in facts about the debtor/contractor; it was not the creditor's duty to volunteer the information); *Osborne v. Chicago Bonding & Sur. Co.*, 96 Wash. 133, 136, 164 P. 742 (1917) (paid surety company did not inquire how consideration for a bond to ensure completion of building was to be paid by purchaser of property because surety was indifferent about the means of payment and trusted the credit of the principal who obtained the bond; surety was liable for unpaid sum to satisfy liens on building).

---

extension of credit to Whitehill, which enabled Taylor to sell the boat for more than the quick sale value and allowed Taylor to satisfy his debt and meet other obligations. We need not decide here whether or not Taylor was a compensated surety because, even if he was uncompensated and the Bank's duty of disclosure was greater, we find that the Bank did not violate its duty.

We note, however, that several cases have departed from the definition of compensated surety in the Restatement of Security § 82, comment *i*, at 233–34 (1941). The Restatement uses the term to mean

> a person who engages in the business of executing surety contracts for a compensation called a premium . . . Other sureties, whether strictly gratuitous or whether receiving some pecuniary advantage, whose surety contracts are occasional and incidental to other business, are not included among compensated sureties.

In contrast, in *Honolulu Roofing Co. v. Felix*, 49 Hawaii 578, 426 P.2d 298, 317 (1967), the court held that a lumber company executing a bond as surety for a contractor in order to become the supplier of lumber to the contractor should be treated as a compensated surety even though the company was not in the business of executing surety contracts for a premium. In *Equitable Sav. & Loan Ass'n v. Jones*, 268 Or. 487, 522 P.2d 217, 219 (1974), the defendants, owners of real property, subordinated their property to induce a loan which would make possible increased rental from the land. This placed them in a position where they had to refinance their property or lose it. The element of self-interest in these circumstances persuaded the court that it was not reasonable to favor a surety whose character was "hybrid", between a compensated and gratuitous nature. Our court has stated that where stockholders and directors of a corporation guaranteed loans to enable the bank to extend credit to the corporation, they were receiving an economic benefit, which removed them from the status of uncompensated sureties. *Old Nat'l Bank v. Seattle Smashers Corp.*, 36 Wn. App. 688, 693, 676 P.2d 1034 (1984).

In the present case, it is undisputed that the Bank told Taylor that it would not make the loan to Whitehill without Taylor's guaranty. Taylor knew he was executing the guaranty to enable the boat to sell immediately, at a price over $20,000 above the quick sale price. Finding of fact 13. Thus, Taylor clearly was benefited by his execution of the guaranty and he was presumably motivated to make the guaranty by the prospect of this benefit.

The trial court did not find that Jorgensen misrepresented the down payment as cash from Whitehill's funds. Assuming the Bank's duty to disclose is greater in this case than if Whitehill had requested the guaranty, nevertheless, there is no evidence that the Bank misrepresented or concealed facts so as to induce or permit Taylor to guarantee the loan in reliance on a false impression as to the nature of the risk. *See Sumitomo,* 73 Cal Rptr. at 567; Restatement of Security § 124(1), comment *b,* at 329 (1941). "[I]f the creditor is nothing more than negligent in not discovering facts which affect the risk the surety will not be discharged of his obligation." *Notte,* at 218.[5] The creditor owes a duty of good faith to the surety, *Carpenter Lumber Co. v. Hugill,* 149 Wash. 45, 48, 270 P. 94 (1928); but in this case the evidence does not indicate that the Bank's statements or its silence violated that duty. Based on these principles, we hold that the findings support any conclusions of law contained in findings of fact 36, 37, 38, 41,[6] 42, 43, and 45, as well as conclusions of law 1(3), 3, 4, 7, and 9.

---

[5] "[T]he relationship between the creditor and the surety does not in itself give rise to strict fiduciary obligations." *First Nat'l Bank & Trust Co. v. Notte,* 97 Wis. 2d 207, 215, 293 N.W.2d 530, 534 (1980) (citing *Sumitomo Bank v. Iwasaki,* 70 Cal. 2d 81, 85 n.3, 447 P.2d 956, 73 Cal. Rptr. 564, 567 (1968)).

[6] Finding of fact 41 states, "at the time Taylor gave his guaranty, no bridge loan was contemplated." Taylor contends that his guaranty could not be a contractual commitment binding on him until the Bank closed the loan to Whitehill. The guaranty was signed on January 18, 1979, but the loan was not formally approved until February 1979, after the bridge loan had been arranged. Taylor argues that he could have unilaterally revoked his guaranty if the Bank had provided him with information about Whitehill's loan arrangements. (The guaranty provides that it is a continuing agreement "until revoked.") However, whether guaranty was binding in January or in February does not affect the Bank's duty to disclose. As our analysis demonstrates, the Bank had no duty to disclose the bridge loan to Taylor either before or after he signed the guaranty. Because the bridge loan was separate and did not affect the guaranty of the vessel loan, Taylor's challenge to finding of fact 41 is without merit.

Taylor also contends that if he had known the full circumstances of Whitehill's credit and the bridge loan, he could have revoked his guaranty. Again, whether Taylor would have revoked or not is speculative and does not raise an issue of fact concerning the Bank's duty to disclose more details to him at the time he entered into the guaranty.

### EQUITABLE APPLICATION OF PAYMENTS
### TO TAYLOR'S GUARANTY

Taylor contends that because he was misled by the Bank's failure to disclose facts about Whitehill which it knew would materially increase the risk Taylor intended to assume, the payments made by Whitehill on the bridge loan should be equitably applied to Taylor's surety obligation. He relies on *Warren v. Washington Trust Bank,* 92 Wn.2d 381, 598 P.2d 701 (1979) for this argument. *Warren* states the rule that normally, when a principal owes more than one obligation to a creditor and makes payments out of his own funds, the creditor must apply payments in accordance with the principal's directions, and if there are no directions, the creditor may apply the payments as he sees fit. *Warren,* at 384. An exception may be made to apply payments in favor of the surety "only where the surety . . . can demonstrate a special equity which makes his interests more amenable to protection than those of the creditor and the principal." *Warren,* at 385.

Taylor has not demonstrated circumstances which warrant placing him within this equitable exception. The trial court found that the loans were separate and distinct; therefore, following the normal rule, the Bank properly applied payments received from Whitehill (as interest) and then from the Ulrichs to the bridge loan first, as that loan generated the cash for the down payment on the boat.

Moreover, Taylor does not assign error to findings of fact 21 and 22, which describe the payments made on the bridge loan and the Ulrichs' refinancing and ultimate payment of that loan; nor does Taylor assign error to conclusion of law 10, which (1) states that the court is not bound by equity to apply payments on the bridge loan to Taylor, and (2) rejects the invitation to apply the payments as Taylor requests under any discretionary power the court might have. We conclude that the findings (including challenged finding of fact 23) support the conclusions of law (including challenged conclusion of law 8), and the trial court's decision on this issue was correct.

ATTORNEY FEES

The Bank, as prevailing party on appeal, is entitled to attorney fees based on the guaranty contract, and it has complied with RAP 18.1. Attorney fees in the amount of $3,500 are awarded together with costs on appeal.

For all the foregoing reasons, the judgment of the trial court is affirmed.

WILLIAMS and GROSSE, JJ., concur.